[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 774 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 775 
OPINION
Plaintiff Sea-Land Service, Inc. (hereinafter Sea-Land) appeals from a judgment denying relief in an action for the refund of ad valorem personal property taxes assessed and collected by defendant county on certain cargo shipping containers.[1]
Sea-Land contends the county is without statutory authority to tax this movable personal property and that the containers, as instrumentalities of foreign and interstate commerce, are exempt from local taxation under the commerce and import-export clauses of the United States Constitution. We conclude that these contentions are without merit and that the containers are subject to an apportioned local property tax.
Sea-Land is a shipping company incorporated under the laws of Delaware with its commercial domicile in New Jersey. The company operates vessels in interstate (i.e., intercoastal) and foreign trade. Its vessels are documented at Wilmington, Delaware, or at foreign ports, and none is registered in California. Sea-Land also owns and operates more than 37,000 cargo shipping containers, a certain number of which were present *Page 776 
within the defendant county on the respective lien dates of the years 1967, 1968, and 1969. In these years the county, acting on its own behalf and on behalf of defendant City of Oakland, assessed property taxes on the empty shipping containers within the jurisdiction on the lien dates.
The essential facts are stipulated by the parties. The taxes assessed and the numbers of containers physically present on the lien dates in the city and the county were: 1967 — $46,346 (833 containers); 1968 — $110,272.63 (1,561 containers); and 1969 — $144,518.68 (2,095 containers). Sea-Land paid these taxes under protest. The county assessment appeals board denied Sea-Land's appeals, and timely claims for refunds of the 1967 and 1968 taxes were denied by the county board of supervisors.
The containers in issue are used exclusively for transportation of cargo for hire in interstate and foreign commerce; none is used for intrastate transportation of cargo, and intrastate movements of empty containers are solely for the purpose of picking up cargo to be carried in interstate or foreign commerce. Eighty-five percent (65 percent in 1967) of the containers physically present within defendants' borders on the respective lien dates were loaded with cargo either inbound from or outbound to foreign ports; the remaining 15 percent (35 percent in 1967) were loaded with cargo bound to or from interstate ports. The interstate service is between California and the east coast, with stops in Panama and Puerto Rico; the foreign service is to Europe and the Orient.
No container has a usual place of return between voyages, but each is in constant transit save for time for repair and awaiting new cargo. The containers, after discharge from the vessel, are transported by truck or rail, either by Sea-Land's trucks within the terminal area or by independent common carriers, to the ultimate destination of the cargo. The inland destinations and origins of cargo include California and other states. The unloaded cargo container is then brought to the vessel by rail or truck after being loaded with outbound cargo. None of the containers present on the lien dates had been on hand for as much as 6 of the 12 months prior to that date. The average stay of any of the containers in California is less than three weeks, and no container is permanently stationed in California or scheduled, on departure from the terminal area, to return specifically to Oakland.
The number of containers physically present on each lien date was fairly representative of the number present on other days at that level of operations; an increase in operations and equipment during each year caused the increase in absolute numbers from year to year. *Page 777 
Sea-Land's vessels are designed to carry cargo exclusively in containers, and only Sea-Land's vessels and truck bodies are designed to accommodate the 35-foot length of these containers.
(1a) Sea-Land first contends that the county lacks statutory authority to tax its containers. The contention is without merit.
Article XIII, section 1, of the California Constitution provides: "(a) All property is taxable and shall be assessed at the same percentage of fair market value. . . . [¶] (b) All property so assessed shall be taxed in proportion to its full value." Cargo containers are personal property and, unless exempted, must be assessed and subjected to property tax. None of the specific statutory exemptions set forth in Revenue and Taxation Code sections 202 to 228 applies to cargo containers.[2]
(2) Sea-Land asserts, however, that pursuant to article XIII, section 14, of the Constitution, property can be assessed only in the locality in which it is "situated."[3] Its contention is that under the provisions of title 18, section 205, of the California Administrative Code, movable property such as the containers here in issue becomes "situated" for tax purposes in the county where located on the lien date only if the property "has been in the county for more than 6 of the 12 months immediately preceding the lien date."[4] Since it was stipulated that the average stay of *Page 778 
the containers in California is less than 3 weeks and none of the containers present on the lien dates had been in Alameda County for as much as 6 of the preceding 12 months, Sea-Land argues that the containers did not acquire a taxable situs there. Rather, it contends that under section 205 the containers had to be taxed at its "principal place of business," the State of New Jersey.
Section 205 of title 18 sets forth a rule for establishing the taxable situs of specific property which moves from place to place within this state. The rule is predicated upon the theory that unless the property has been within the taxing jurisdiction for at least 6 of the 12 months immediately preceding the lien date, the property has failed to acquire sufficient "contacts" with that jurisdiction to create a taxable situs.
However, the cited administrative code section is merely interpretative of existing law, and is neither a statutory mandate nor all-encompassing in its description.[5] It has no application to a determination of the situs of movable property consisting of the same or similar units having repeated contact with the local taxing authority. While no specific container may be in the county for a substantial period of time, Sea-Land's containers are physically present in the county on every day of the year. Such habitual presence of containers creates a taxable situs, even though the identical containers are not there every day and even though none of the containers is continuously within the county. (Braniff Airways v. Nebraska Board (1954)347 U.S. 590, 600-601 [98 L.Ed. 967, 977-978, 74 S.Ct. 757]; JohnsonOil Co. v. Oklahoma (1933) 290 U.S. 158, 162 [78 L.Ed. 238, 242, 54 S.Ct. 152]; Pullman's Car Co. v. Pennsylvania (1891)141 U.S. 18, 25-26 [35 L.Ed. 613, 617-618, 11 S.Ct. 876]; see also Zantop Air Transport, Inc. v. County of San Bernardino
(1966) supra, 246 Cal.App.2d 433, 437.) *Page 779 
(1b) In Braniff the United States Supreme Court approved an apportioned ad valorem property tax on the flight equipment of an interstate air carrier whose contact with the local taxing authority was established on the basis of 18 stops per day. As Justice Douglas observed in his concurring opinion, "Property in transit may move so regularly and so continuously that part of it is always in the State. Then the fraction, but no more, may be taxed ad valorem." (347 U.S. at p. 603 [98 L.Ed. at p. 978]; see also Ott v. Mississippi Barge Line (1949) 336 U.S. 169 [93 L.Ed. 585, 69 S.Ct. 432].) The assessor here has not attempted to assess all Sea-Land's containers which pass through the county. He has levied a tax only on the value of that portion which represents the average number of containers located in the county on a daily basis.[6] Such a method of assessment is permissible under Braniff.
Sea-Land attempts to distinguish Braniff on the ground that the tax there was levied under a specific state statute providing for the taxation of instrumentalities of interstate commerce on an apportioned basis. (See Braniff Airways v. Nebraska Board
(1954) supra, 347 U.S. at p. 593, fn. 4 [98 L.Ed. at p. 973].) By contrast, it is said, California's lien-date structure of property taxation precludes taxation on an "average presence" basis.[7] Thus Sea-Land asserts that express statutory authority is required before a local taxing authority may levy a tax on that portion of the containers which represents the average number physically present in the county on a daily basis.
We do not agree. The constitutional dictate of article XIII, section 1, that "All property . . . shall be taxed in proportion to its full value" is direct and mandatory. (Cal. Const., art. I, § 28; Bauer-Schweitzer Malting Co. v. City and County of SanFrancisco (1973) 8 Cal.3d 942, 946 [106 Cal.Rptr. 643,506 P.2d 1019]; San Pedro etc. R.R. Co. v. Los Angeles (1919) 180 Cal. 18, 21 [179 P. 393]; see also Ex-Cell-O Corp. v. County ofAlameda (1973) 32 Cal.App.3d 135, 139 [107 Cal.Rptr. 839].) Thus *Page 780 
no specific statutory authority is necessary to levy this tax, which is consistent with the constitutional requirement.
In any event, statutory authority for taxation on an "average presence" basis can be found in section 201 of the Revenue and Taxation Code, which provides: "All property in this State, not exempt under the laws of the United States or of this State, is subject to taxation under this Code." (See also Rev. Tax. Code, §§ 401, 405.) Express statutory authorization for the lien-date structure of property taxation does not preclude other fair and reasonable methods of assessment. (See Allied Stores of Ohio v.Bowers (1959) 358 U.S. 522 [3 L.Ed.2d 480, 79 S.Ct. 437].)[8]
(3) Sea-Land urges that the taxation of its containers on an "average presence" basis violates principles of equal protection because other property owners in the state are taxed on the basis of property which is in fact present on the lien date. This contention also lacks merit. Local taxation based on an appraisal and valuation of the average amount of movable personal property habitually employed within the territorial limits of the taxing authority is clearly constitutional. (Johnson Oil Co. v.Oklahoma (1933) supra, 290 U.S. 158, 162; Union RefrigeratorTransit Co. v. Lynch (1900) 177 U.S. 149 [44 L.Ed. 708, 20 S.Ct. 631]; American Refrigerator Transit Co. v. Hall (1899)174 U.S. 70, 82 [43 L.Ed. 899, 904, 19 S.Ct. 599].) The equal protection clause of the United States Constitution imposes no invariable rule of total equality in the exercise of the state's taxing power; flexibility and variety are appropriate to reasonable schemes of state taxation. (Allied Stores of Ohio v.Bowers (1959) supra, 358 U.S. 522, 526 [3 L.Ed.2d 480, 484].) Taxation on an "average presence" basis of movable personal property consisting of similar units a number of which are continuously employed within the local jurisdiction is both fair and reasonable. Any difference in the method of assessment applied to Sea-Land's property as compared to the assessment of property in fact present on the lien date is clearly justified in light of the constitutional and legislative mandate that all property within the state bear a fair share of the tax burden. Therefore taxation of the containers on an "average presence" basis is not violative of equal protection. (Allied Stores ofOhio v. Bowers (1959) supra, 358 U.S. 522, 527-528 [3 L.Ed.2d 480, 484-485].) *Page 781 
(4a) Sea-Land further contends that its containers, as instrumentalities of foreign commerce and interstate commerce via international waters, are exempt from taxation by defendant county under the commerce clause of the United States Constitution.[9] (5) Sea-Land does not claim that its containers are protected from all local taxation. It recognizes the well-established rule that "the Commerce Clause does not immunize interstate instrumentalities from all state taxation, but . . . such commerce may be required to pay a nondiscriminatory share of the tax burden." (Braniff Airways v.Nebraska Board (1954) supra, 347 U.S. at pp. 597-598 [98 L.Ed. at pp. 975-976].)[10] (4b) Rather, Sea-Land relies on the "home-port" doctrine, established in Hays v. Pacific MailSteamship Co. (1854) supra, 58 U.S. (17 How.) 596, and its progeny.[11] Under this concept instrumentalities of commerce such as the containers involved here are subject to property taxes only in their home port (here, the State of New Jersey) and are exempt from property taxes in other jurisdictions, even those in which the instrumentalities make regular visits.
In Hays, the United States Supreme Court forbade California from *Page 782 
levying a property tax on the full value of an ocean-going vessel, owned and registered in New York and operating in interstate commerce between that port and various ports in California and Oregon. The decision established the rule that such a vessel could be taxed at its full value in its home port, and that other states in which it engaged in commerce were not entitled to levy a property tax of any nature, even though the vessel made regular stops therein for the purpose of discharging or taking on passengers and cargo or making repairs. The decision was predicated in part on the lack of a taxable situs in any but the home port, since the temporary visit of a ship to a port of call in the course of trade did not vest that port with jurisdiction to levy a property tax. (Id. at pp. 599-600 [15 L.Ed. at p. 255].) The holding also appears to be based in part on the commerce clause, since the court made reference to such commerce being subject to the "laws of the general government. . . ." (Id. at p. 599 [15 L.Ed. at p. 255].)
However, the home-port doctrine, denying nondomiciliary jurisdictions the power to levy property taxes, has been eroded in a series of United States Supreme Court decisions approving apportioned ad valorem property taxes levied by other local jurisdictions having sufficient contacts with vehicles engaged in interstate commerce. The apportionment doctrine was applied first to railroad rolling stock, then to vessels operating on inland waters, and finally to airplanes flying interstate routes.
In Pullman's Car Co. v. Pennsylvania (1891) supra,141 U.S. 18, the Supreme Court upheld a tax by a nondomiciliary state on rolling stock of an interstate rail carrier apportioned according to the track mileage within the taxing state as compared to total track mileage in all other states. The earlier cases involving vessels were distinguished on the ground that ships which ply the high seas and touch ports of call only incidentally and temporarily have "no continuous presence or actual situs" in a jurisdiction other than their home port (id.
at p. 23 [35 L.Ed. at p. 616]), while in Pullman "the company has at all times substantially the same number of cars within the State, and continuously and constantly uses there a portion of its property; . . ." (Id. at p. 26 [35 L.Ed. at p. 617].)
The principle of Pullman, in which the rolling stock followed prescribed routes and schedules, was extended in AmericanRefrigerator Transit Co. v. Hall (1899) supra, 174 U.S. 70. In Hall the Supreme Court sustained the constitutionality of a Colorado property tax on a stipulated average number of railroad cars which had been located within the territorial limits of the state during the taxing year, although it was agreed by the parties that the cars "never were run in said State in fixed numbers *Page 783 
nor at regular times, nor as a regular part of particular trains . . ." (Id. at p. 72 [43 L.Ed at p. 900].) The court nonetheless held that the habitual employment of a substantial number of cars within the state, albeit on irregular routes, was sufficient to establish a tax situs permitting taxation of the average number of cars so engaged. The court stated that a tax on an "average presence" basis was proper although "the specific and individual items of property so used and employed were not continuously the same, but were constantly changing, according to the exigencies of the business. . . ." (Id. at p. 82 [43 L.Ed. at p. 904].) (See also Union Refrigerator Transit Co. v.Lynch (1900) supra, 177 U.S. 149; Johnson Oil Co. v.Oklahoma (1933) supra, 290 U.S. 158, 162; Central R. Co. v.Pennsylvania (1962) 370 U.S. 607, 615 [8 L.Ed.2d 720, 727, 82 S.Ct. 1297].)
The home-port doctrine was later held inapplicable to vessels operating on inland waterways in Ott v. Mississippi BargeLine (1949) supra, 336 U.S. 169. There the court upheld an apportioned ad valorem property tax levied in Louisiana on tugs and barges owned by an out-of-state corporation operating in interstate commerce along the Mississippi River. The court distinguished the home-port doctrine on the ground that in the earlier cases the element of apportionment was neither raised nor considered. Instead, the court followed Pullman, declaring, "We see no practical difference so far as either the Due Process Clause or the Commerce Clause is concerned whether it is vessels or railroad cars that are moving in interstate commerce. The problem under the Commerce Clause is to determine `what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions.' [Citation.] So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State. [Citation.] Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State." (Id.
at p. 174 [93 L.Ed. at p. 589].)[12]
Standard Oil Co. v. Peck (1952) 342 U.S. 382 [96 L.Ed. 427, 72 S.Ct. 309, 26 A.L.R.2d 1371], further eroded the home-port doctrine by prohibiting a state from taxing the entire value of a domestic company's boats and barges engaged in interstate commerce. The court stated, "The rule which permits taxation by two or more states on an apportionment *Page 784 
basis precludes taxation of all of the property by the state of the domicile. [Citation.] Otherwise there would be multiple taxation of interstate operations and the tax would have no relation to the opportunities, benefits, or protection which the taxing state gives those operations." (Id. at pp. 384-385 [96 L.Ed. at p. 430].)
Thereafter, in Braniff Airways v. Nebraska Board (1954)supra, 347 U.S. 590, the court sanctioned an apportioned tax by Nebraska on Braniff's airplanes which were domiciled elsewhere but engaged in interstate commerce in Nebraska. The court reiterated the test of whether it is fair for the jurisdiction to levy a tax in return for "opportunities, benefits, or protection conferred or afforded by the taxing State" (id. at p. 600 [98 L.Ed. at p. 977]), and focused on the issue of whether brief stops in Nebraska by Braniff's planes for the purpose of discharging and loading passengers, mail and freight, and for refueling, created a taxable situs in the state. The court concluded, "Thus the situs issue devolves into the question of whether eighteen stops per day by appellant's aircraft is sufficient contact with Nebraska to sustain that state's power to levy an apportioned ad valorem tax on such aircraft. We think such regular contact is sufficient to establish Nebraska's power to tax even though the same aircraft do not land every day and even though none of the aircraft is continuously within the state. `The basis of the jurisdiction is the habitual employment of the property within the State.'" (Fn. omitted.) (Id. at pp. 600-601 [98 L.Ed. at p. 977].)
Sea-Land concedes, as it must, that the foregoing decisions clearly authorize the taxation of instrumentalities of interstate commerce on an apportioned basis. However, it contends the reach of these decisions does not extend to instrumentalities of foreign commerce or of interstate commerce via international waters, such as its containers. As to the latter it is argued that the home-port doctrine retains its vitality.
Sea-Land relies principally on the decision of this court inScandinavian Airlines System, Inc. v. County of Los Angeles
(1961) 56 Cal.2d 11 [14 Cal.Rptr. 25, 363 P.2d 25] (hereinafterSAS). In SAS the court struck down an apportioned ad valorem tax levied by the City and the County of Los Angeles on the aircraft of a foreign-owned air carrier operating exclusively in foreign commerce. The airplanes purportedly subject to taxation were flown on international routes, stopping in Los Angeles, their only landing point in the United States, in the course of flights between their European home ports and Canada. During the period involved, each of the aircraft averaged only eight round-trip flights per year, and remained in Los Angeles less than 34 hours each flight. None of the planes was *Page 785 
physically present in Los Angeles, or elsewhere in the United States, on the lien date of the year for which the taxes were levied. Each of the airplanes was also taxed, on an unapportioned basis, at its home port in Europe.
After reviewing the relevant decisions dealing with the home-port doctrine and the apportionment doctrine, the majority of this court concluded that "airplanes, flying the international skies, do not differ substantially from vessels sailing the international seas" (id. at p. 32), and therefore reaffirmed the home-port doctrine as to instruments of communication with other nations. Thus the majority held that "the power to tax airplanes engaged solely in commerce with foreign nations is vested exclusively in the place of true domicile, which jurisdiction may impose a tax on the full value, to the exclusion of property taxation elsewhere, whether upon an apportioned basis or otherwise." (Id. at pp. 36-37.)
The holding in SAS was based on the conclusion that the repudiation of the home-port doctrine as applied to railroad rolling stock (Pullman), vessels operating in inland waterways (Ott), and aircraft flying interstate routes (Braniff), did not alter the doctrine as applied to vessels plying international waters, because "an instrumentality of commerce which leaves the nation's shores becomes so peculiarly imbued with international characteristics that it would be unwise to allow any state but that of domicile to exercise sovereignty beyond that necessary under ordinary police powers." (Id. at pp. 25-26.) Stated another way, once an instrumentality of commerce left its home port for international waters, it was protected from taxation in other jurisdictions because the regulation of foreign commerce was a matter of "exclusive federal concern." (Id. at p. 25.) The court rejected the apportionment doctrine in this context because "[w]hen . . . a vehicle becomes an instrument of communication with foreign nations it is apparent that the apportioned basis of taxation is unworkable because the courts of this country can exercise no control over the foreign taxing authorities" (id. at p. 32), thus giving rise to the threat of double taxation. Applying these principles to foreign-owned aircraft flying international routes, the majority resurrected the home-port doctrine, and held "no jurisdiction save that of domicile has any authority to levy a personal property tax on these airplanes." (Id. at p. 33.)
Although the result in SAS may lend superficial comfort to those relying upon the continued viability of the home-port doctrine, the opinion is distinguishable on several grounds. First, in SAS the aircraft were engaged exclusively in foreign commerce, whereas containers involved here are employed in interstate as well as foreign commerce. Thus in SAS *Page 786 
the crucial issue was whether any state could tax the property of a foreign-owned company engaged exclusively in international air commerce, whereas the central issue before us is which
state may tax the property of a domestic company engaged in foreign and interstate commerce. It bears emphasis that Sea-Land concedes its containers are subject to state taxation; it urges only that such taxation should be governed by the home-port doctrine.
Secondly, the aircraft in SAS had only minimum contacts with Los Angeles, each landing there only eight times per year, while the containers herein have a daily contact with Alameda County and the City of Oakland and have obtained a taxable situs other than their home port by such permanency of location and use within the taxing jurisdiction. Thirdly, the holding in SAS was based partly on an interpretation of treaties between the United States and foreign countries, a consideration absent from this case.
Therefore we are not inhibited by SAS from concluding that the home-port doctrine does not shield the property of a taxpayer from a fairly apportioned ad valorem tax levied by a nondomiciliary jurisdiction with which the taxpayer has sufficient contacts, even if the taxpayer is engaged in foreign commerce or interstate commerce via international waters.[13]
The principles of apportioned taxation enunciated in Pullman,Ott, and Braniff are to be applied to instrumentalities so engaged.
When the home-port rule was formulated for the taxation of ships in interstate as well as foreign commerce, the concept of taxation on an apportioned basis had yet to be developed. (SeeOtt v. Mississippi Barge Line (1949) supra, 336 U.S. 169, 173 [93 L.Ed. 585, 588-589].) Since its development no decision of the United States Supreme Court has reverted *Page 787 
to the anachronistic home-port doctrine.[14] The apportionment theory, on the other hand, has been recognized as appropriately applied to a variety of instrumentalities of commerce. Indeed, this court implicitly accepted the validity of a properly apportioned tax in Flying Tiger Line, Inc. v. County of L.A.
(1958) 51 Cal.2d 314, 318-319 [333 P.2d 323], in which we struck down a tax on the full value of aircraft flying in international routes owned by a corporation domiciled in California. An unapportioned tax was held to be improper because we acknowledged that the rule which permits taxation by two or more states on an apportioned basis precludes taxation of all the property by the state of domicile. (See also Slick Airways v. County of LosAngeles (1956) 140 Cal.App.2d 311, 315 [295 P.2d 46].)
Next Sea-Land refers to evidence of federal regulation of container traffic in international commerce to support a contention that the field is preempted by such involvement. It cites provisions of 19 Code of Federal Regulations section 10.41a, which designate containers as "instruments of international traffic." These regulations merely exempt the containers from the levy of a customs duty every time the containers arrive in a port. They are inapplicable to a determination of whether the containers are taxable only at the owner's home port rather than in the several states on an apportioned basis. As we have seen, federal regulation of interstate and foreign carriers under the commerce clause does not deny state power to appropriately tax the property of such carriers. (See Braniff Airways v. Nebraska Board (1954)supra, 347 U.S. 590, 594-597 [98 L.Ed. 967, 974-975].) Nor do the treaties and agreements between the United States and foreign nations relating to the movement of containers in international commerce have any bearing on the issue before us.
Reliance on the home-port doctrine is also urged because of the spectre of double taxation. For that reason, the majority inSAS concluded (56 Cal.2d at p. 32) that "the apportioned basis of taxation is unworkable" for instruments of communication with other nations "because the courts of this country can exercise no control over the foreign taxing authorities." *Page 788 
However, it is clear that any threat of multiple burdens imposed by foreign taxing authorities is irrelevant to the crucial commerce clause issue of whether any state is discriminating against interstate or foreign commerce. As Justice Traynor pointed out in his dissent in SAS, "The issue is whether there is discrimination against foreign commerce. Obviously there is no discrimination if a state taxes migratory property used in such commerce in the same way it taxes migratory property used in interstate commerce. Moreover, it precludes discrimination against interstate commerce." (Id. at p. 44.)
Justice Traynor recognized that the fear of multiple burdens imposed by foreign taxing authorities is not a proper constitutional concern. The threat of multiple burdens in international commerce is not attributable to discrimination, "it is attributable to the freedom of foreign countries . . . to adopt rules of their own. . . . The court cannot prevent foreign countries from taxing instrumentalities of foreign commerce owned by their domiciliaries even if those instrumentalities are permanently located here, just as it cannot prevent foreign countries from taxing American aircraft temporarily abroad even though they have been taxed at full value at the domicile of their owners here." (Ibid.)
Merely because a state court is without jurisdiction to compel independent nations to adopt a uniform nondiscriminatory system of taxation, "It does not follow that the states must forego the power to impose taxes that are not in themselves discriminatory." (Id. at p. 45.) In analyzing the decision in SAS Justice Traynor noted, "It is not for us to determine whether reciprocal exemptions away from home and exclusive taxation at the domicile would foster commerce, simplify tax administration, and fairly divide tax revenues among the jurisdictions that aircraft link. Such a decision involves policies that properly can be crystallized only in legislation or treaties." (Id., at p. 49.)
Thus the threat of double taxation from foreign taxing authorities has no role in commerce clause considerations of multiple burdens. Indeed, it is gratuitous to suggest that a state is alleviating any threat of multiple burdens by limiting its own taxing power, when foreign nations may tax instrumentalities of commerce that touch their jurisdiction at any rate they choose. The commerce clause mandates apportionment among the several states in order to avoid discriminatory burdens on interstate or foreign commerce. But apportionment among nations is a matter for international agreement; it should not be considered as a limitation on a state's power to tax. *Page 789 
Sea-Land also attempts to characterize its containers as integral or functional parts of its vessels. (See Leather'sBest, Inc v. S.S. Mormaclynx (2d Cir. 1971) 451 F.2d 800, 815.) However, the fact that the containers are specifically designed to be carried aboard ship does not alter their property status or immunize them from local taxation. The containers are likewise specially designed to be carried on land; thus their shape in no way affects their habitual and continuous presence within the taxing jurisdiction.
(6) And finally, Sea-Land contends on several theories that its containers are exempted under the import-export clause of the United States Constitution. (Art. I, § 10, cl. 2; Brown v.Marvland (1827) 25 U.S. (12 Wheat.) 419 [6 L.Ed. 678].) This contention is likewise without merit. The protection from state and local taxation afforded by this clause attaches to goods and commodities in the import-export stream; it does not extend to containers, which are a means of transport suitable for repeated use. The distinction was recently recognized in VolkswagenPacific, Inc. v. City of Los Angeles (1972) 7 Cal.3d 48, 55 [101 Cal.Rptr. 869, 496 P.2d 1237], in which we referred to containers as "means of transportation" and discussed the difference between the container and the separate parcels of goods contained within it.
Accordingly, we conclude that the containers were properly subjected to the tax here challenged. The judgment is affirmed.
Wright, C.J., McComb, J., Tobriner, J., Burke, J., Sullivan, J., and Clark, J., concurred.
[1] A cargo shipping container is a permanent, reusable article of transport equipment durably made of metal and equipped with doors for easy access to the goods carried inside. It is designed to facilitate the handling, loading, stowage aboard ship, carriage, unloading and delivery of large numbers of packages of goods contained within, thus minimizing the costs and risks of processing each package individually. "Containerization" developed as an efficient and economical method of handling and transporting cargo; it provides a means for transferring cargo from one form of transportation, such as ship, to another form of transportation, such as rail or truck, without the necessity of loading and unloading the individual items of cargo each time the mode of transport changes. (Simon, The Law of ShippingContainers (1974) 5 J. Maritime L. 507, 513.)
[2] New section 232 of the Revenue and Taxation Code (added by Stats. 1974, ch. 1405, § 1) exempts from property taxation, for a period of four years, cargo containers used in ocean commerce and defined therein. Sections 3 and 4 of the legislation, however, direct county auditors to file claims with the state Controller for reimbursement of all revenues lost by reason of such exemption, and appropriate the amount of such claims from the state's general fund. (See Rev. Tax. Code, § 2229; Gov. Code, § 16113, subd. (b).) In other words, the local property tax burden imposed on such containers has simply been shifted, on a limited trial basis, from the owners of the containers to the State of California. Thus the taxability of these containers under the state and federal Constitutions remains at issue, and the parties herein do not contend otherwise.
[3] Article XIII, section 14, of the California Constitution (former art. XIII, § 10) provides: "All property taxed by local government shall be assessed in the county, city, and district in which it is situated."
The word "situated" in this section refers not to mere physical presence on the lien date, but to the situs of property within the state necessary to give jurisdiction to tax. (Brock Co.
v. Board of Supervisors (1937) 8 Cal.2d 286, 289-290 [65 P.2d 791, 110 A.L.R. 700]; Zantop Air Transport, Inc. v. County ofSan Bernardino (1966) 246 Cal.App.2d 433, 437 [54 Cal.Rptr. 813] .)
[4] California Administrative Code, title 18, section 205, subdivision (a), provides:
"Movable property is all property which is intended to be, and is, moved from time to time from one location to another. . . .
"Movable property has situs where located on the lien date if it has been in the county for more than 6 of the 12 months immediately preceding the lien date and if it is to remain in or be returned to the county for any substantial period during the 12 months immediately succeeding the lien date. Property which has been in the county for less than 6 of the 12 months immediately preceding the lien date, but which is committed to use in the county for an indeterminate period or for more than six months, has situs there whether the use extends through or commences with the lien date.
"Property which does not have situs where located on the lien date pursuant to the previous paragraph has situs at the location where it is normally returned between uses or, if there is no such location, at the principal place of business of the owner."
[5] Section 205 was adopted by the State Board of Equalization on February 7, 1968, effective March 14, 1968. The effective date of the section was thus subsequent to the lien date for two of the years here in question, 1967 and 1968. Tax statutes are to be applied prospectively only, in the absence of express language or clear legislative intent that they be retroactive. (East BayMunicipal U. Dist. v. Garrison (1923) 191 Cal. 680, 692 [218 P. 43].) Accordingly, section 205 could not govern the years 1967 and 1968 in any event.
[6] The assessor took the position that the number of containers physically present on each lien date was fairly representative of the number present on other days. Thus this number was assumed to represent the average number of containers within the county on a daily basis throughout the year, and the tax was levied on the basis of the depreciated fair market value of this number of containers.
[7] Section 405, subdivision (a), of the Revenue and Taxation Code: "Annually, the assessor shall assess all the taxable property in his county . . . on the lien date."
Section 117 of the Revenue and Taxation Code: "`Lien date' is the time when taxes for any fiscal year become a lien on property."
Section 2192 of the Revenue and Taxation Code: "Except as otherwise specifically provided, all tax liens attach annually as of 12:01 a.m. on the first day of March preceding the fiscal year for which the taxes are levied."
[8] We note in this connection that sections 1101 to 1104 of the Revenue and Taxation Code, providing for the assessment of railroad rolling stock on an apportioned basis, have been repealed by the Legislature. (Stats. 1968, ch. 757, p. 1459, §§ 19-22.) Nevertheless railroad rolling stock continues to be assessed and taxed on an apportioned basis, notwithstanding the repeal of these sections. We take this to mean the Legislature does not regard express statutory authorization of taxation on an apportioned basis as necessary.
[9] United States Constitution, article I, section 8, provides in part: "The Congress shall have power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes. . . ."
The earlier decisions dealing with the validity of local property taxes on instrumentalities of foreign and interstate commerce appear to be based at least in part on the commerce clause; they refer to an area of commerce subject to the "laws of the general government, to which belong the regulation of commerce with foreign nations and between the states." (Hays v.Pacific Mail Steamship Co. (1854) 58 U.S. (17 How.) 596, 599 [15 L.Ed. 254, 255].) Subsequent decisions, however, emphasize a due process approach, focusing on the issue of whether the instrumentalities have sufficient contacts with the local jurisdiction to create a taxable situs. In Braniff the United States Supreme Court noted, "In relying upon the Commerce Clause on this issue [of tax situs] and in not specifically claiming protection under the Due Process Clause of the Fourteenth Amendment, appellant names the wrong constitutional clause to support its position. . . . [T]he bare question whether an instrumentality of commerce has tax situs in a state for the purpose of subjection to a property tax is one of due process." (Braniff Airways v. Nebraska Board (1954) supra, 347 U.S. at pp. 598-599 [98 L.Ed. at p. 976].)
[10] The limitation on the state power to tax such instrumentalities was succinctly stated in Ott v. MississippiBarge Line (1949) supra, 336 U.S. 169, 174 [93 L.Ed. 585, 589]: "So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State." (See also Braniff Airways v. NebraskaBoard (1954) supra, 347 U.S. at p. 600 [98 L.Ed. at p. 977].)
[11] St. Louis v. The Ferry Co. (1871) 78 U.S. (11 Wall.) 423 [20 L.Ed. 192]; Morgan v. Parham (1873) 83 U.S. (16 Wall.) 471 [21 L.Ed. 303]; Gloucester Ferry Co. v.Pennsylvania (1885) 114 U.S. 196 [29 L.Ed. 158, 5 S.Ct. 826];Ayer Lord Co. v. Kentucky (1906) 202 U.S. 409 [50 L.Ed. 1082, 26 S.Ct. 679]; see also Southern Pacific Co. v.Kentucky (1911) 222 U.S. 63 [56 L.Ed. 96, 32 S.Ct. 13]. In these cases "home port" refers to the permanent domicile of the vessel or the domicile of its owner, not a fictitious home port created merely by registry.
[12] The court specifically limited its holding in Ott to carriers operating in inland waterways, stating, "We do not reach the question of taxability of ocean carriage but confine our decision to transportation on inland waters." (Id. at pp. 173-174 [93 L.Ed. at p. 589].) It should be noted, however, that in leaving the question open the court in no way suggested that the taxation of either ocean or inland carriage would depend on whether the movement was in interstate or foreign commerce.
[13] The same conclusion has been reached in the similar case of rolling stock. In Canadian Pac. Ry. Co. v. King Co. (1916)90 Wn. 38 [155 P. 416], the Washington Supreme Court upheld an apportioned ad valorem tax on railroad cars owned by a Canadian corporation which ran between Canada and Seattle, Washington.
The United States Supreme Court has never interpreted the commerce clause to prevent a state from taxing personal property employed in foreign commerce the same as other personal property within its jurisdiction. (Pullman's Car Co. v. Pennsylvania
(1891) supra, 141 U.S. 18, 23 [35 L.Ed. 613, 616].) In thePassenger Cases (1849) 48 U.S. (7 How.) 283, 402 [12 L.Ed. 702, 752], Justice McLean stated, "A State cannot regulate foreign commerce, but it may do many things which more or less affect it. It may tax a ship or other vessel used in commerce the same as other property owned by its citizens." (See also GloucesterFerry Co. v. Pennsylvania (1885) supra, 114 U.S. 196, 206 [29 L.Ed. 158, 162-163]; Old Dominion Steamship Co. v.Virginia (1905) 198 U.S. 299, 305 [49 L.Ed. 1059, 1062, 25 S.Ct. 686]; Western Union Telegraph Co. v. Taggert (1896)163 U.S. 1, 14 [41 L.Ed. 49, 54, 16 S.Ct. 1054].)
[14] In Northwest Airlines v. Minnesota (1944) 322 U.S. 292
[88 L.Ed. 1283, 64 S.Ct. 950, 153 A.L.R. 245], the Supreme Court held that Minnesota, the domicile of an interstate air carrier and its "home port," was permitted to tax the entire value of a fleet of aircraft although the planes flew in fixed routes in other states. However, this case cannot be read as supporting the home-port doctrine. It held merely that tangible property for which no tax situs has been established elsewhere may be taxed at its full value by the owner's domicile. (See Standard OilCo. v. Peck (1952) supra, 342 U.S. 382, 384 [96 L.Ed. 427, 430]; Braniff Airways v. Nebraska Board (1954) supra,347 U.S. 590, 600-602 [98 L.Ed. 967, 977-978]; Central R. Co. v.Pennsylvania (1962) supra, 370 U.S. 607, 612 [8 L.Ed.2d 720, 725].) *Page 790