**McMARTIN INDUSTRIES, Plaintiff,**

v.

**Richard P. VINAL, District Director of Internal Revenue, Defendant.**

**Civ. 02505.**

United States District Court
D. Nebraska.

June 30, 1969.

John R. Barton, of Crossman, Barton & Norris, Omaha, Neb., and Sutherland, Asbill & Brennan, Washington, D. C., for plaintiff.

James Parker, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

RICHARD E. ROBINSON, Chief Judge.

This is an action for a refund of excise taxes paid by the plaintiff, McMartin Industries, Inc., under protest. Defendant, a District Director of Internal Revenue, has counter-claimed for additional excise taxes which the Service has assessed against plaintiff but which have not been paid. In the interest of brevity the parties to this action will be hereinafter referred to respectively as McMartin and the I. R. S.

McMartin is and was engaged, at all times pertinent hereto, in the business of manufacturing Subsidiary Communications Authorization multiplex receivers [S.C.A. receivers]. It is with respect to the excise tax levied upon the manufacturing of these receivers that both parties base their claims.

The S.C.A. receivers in question, designated as models TN. and TR. 66, 77, and 88, are tuning devices capable of picking up and demodulating program content transmitted over subchannel radio frequencies by FM broadcasting stations.

At this juncture, it is important to note that S.C.A. receivers are fundamentally different than normal household AM or FM receiving sets. The concept of transmitting programmed material via subchannel radio frequencies was developed in 1948. It was discovered that subchannel or subcarrier radio frequencies could be effectively imposed on main channel broadcasts by radio stations. By use of this "piggyback" system the main channel programs are received by ordinary household radio sets and the subchannel programs are received by specially tuned S.C.A. sets. Shortly after "piggyback" transmission proved successful, its inventors petitioned the Federal Communications Commission to sanction its use. The F.C.C. responded by promulgating a set of regulations known as Subsidiary Communications Authorization. The regulations control, among other things, who may qualify for licensed use, the hours within which subchannel transmissions may be made, and the various types of programming that may be transmitted. Illustrative uses for which subchannel frequencies may be employed are stated in the following excerpt:

"Transmission of programs which are of a broadcast nature, but which are of interest primarily to limited segments of the public wishing to subscribe thereto. Illustrative services include: background music; storecasting; detailed weather forecasting; special time signals; and other material of broadcast nature especially designed and intended for business, professional, educational, religious, trade, labor, agricultural or other groups engaged in any lawful activity. [2] Transmission of signals which are directly related to the operation of FM broadcast stations; for example: relaying of broadcast material to other FM and standard broadcast stations; remote cueing and order circuits * * *." 47 C.F.R. § 73.293, [Revised 1/1/68].

S.C.A. receivers are usually purchased by FM radio stations since they are the only type of stations authorized to transmit subchannel frequencies. These receivers are distributed to the premises of subscribers wishing to tune in special interest programs of the nature described in the regulations, supra.

In 1959, four years after Subsidiary Communications Authorization regulations were developed, McMartin began manufacturing S.C.A. receivers. Mr. McMartin, President of McMartin Industries, testified that from the outset, McMartin receivers were designed to be utilized for any legitimate purpose permitted by the F.C.C. regulations. The primary use of McMartin S.C.A. receivers during the tax years in question was the reception and amplification of functional and background music. It is sufficient, for purposes of this opinion, to state that functional and background music, as opposed to entertainment music, is designed primarily to create a desired environment for a selected audience. Functional music, which is programmed for the special needs of the client, is commonly used in office buildings to bring about a reduction of errors and increased efficiency of office personnel. Hotels are frequent subscribers of background music, particularly for use in lobbies, in an obvious attempt to provide a calm, pleasant atmosphere for their patrons. The second most common use of McMartin receivers has been store broadcasting. "Storecasting" combines back-

ground-functional music and intermittant voice messages. The latter is used to entice shoppers at a particular location to purchase specified products. The third most frequent use of McMartin receivers has been what is termed "rebroadcasting." "Rebroadcasting", as we understand it, is the relaying of programmed material from one station to another; sometimes for broadcast use at a later time in the program day by the receiving station.

There are presently also other less common, but significant, uses for S.C.A. receivers. Mobile units, such as taxis, trucks, etc., are often equipped with S.C.A. receivers which enable them to keep in contact with base units. Receivers are also used for educational broadcasts, "educating"; contacting doctors, "doctorcasting"; and for relaying news and weather reports to special interest groups.

There is little doubt, at least from a functional standpoint, that S.C.A. receivers and their accompanying transmitters constitute a point-to-point communications link similar to a telephone. S.C.A. receivers of the type in question have a fixed frequency, with the capability of receiving only programmed material transmitted on the subchannel to which they are lock-tuned. Therefore, the limited segment of the public interested in a particular transmission must subscribe to the service offered by the licensed FM station and have a properly tuned S.C.A. receiver installed in its premises. In many instances, for example, in a chain of super-markets, more than one S.C.A. receiver is tuned to the same transmission. Technically, where more than one receiver is tuned to the same program, the transmission is of a broadcast nature. Reception by more than one S.C.A. receiver of the same program is not, however, "broadcasting" per se since the programs are not disseminated to the general public.

Mr. Halstead, one of the innovators of "piggy-back" broadcasting, stated, as an expert opinion, that the service was the equivalent of a point-to-point communication link. Two letters from the F.C.C., in response to inquiries by McMartin, substantiate Mr. Halstead's opinion. [Plaintiff's Exhibit #10].

"

xx
20544
May 18, 1964

8843

"McMartin Industries, Inc.
605 North 23rd St.,
Omaha, 2, Nebraska.

Attention: Ray B. McMartin, President

Gentlemen:—

Reference is made to your letter of May 4, 1964, addressed to Mr. Harold Kassons of the Commission's staff.

Unlike conventional broadcast transmissions, FM multiplex signals transmitted on sub-carrier frequencies under a Subsidiary Communications Authorization [SCA] are treated as privileged messages not subject to interception and use by persons not authorized by the sender. It follows that programs transmitted under an SCA are not "broadcast[s]" within the meaning of Section 605 of the Communications Act of 1934, as amended.—see Paragraph 19 of the enclosed Report and Order [Docket No. 12517].

Except for the establishment of limits on receiver radiation, the Commission does not regulate the manufacture, distribution and sale

of radio receivers, nor do the Commissions' Rules differentiate between broadcast receivers and communications receivers. In common usage, however, "broadcast receivers" are understood to be those capable of receiving main channel AM and FM program transmissions "intended to be received by the public * * *"—Section 3(o), Communications Act of 1934 as amended. By implication, other types of receivers [including crystal-controlled SCA multiplex receivers] would be properly classified as "communications receivers".

Very truly yours,

Ben F. Waple
Secretary

enclosure

SIGNED BY ABOVE
MAILED BY
May 19, 1964
MAIL & FILES     "

"                                    20554
                                November 5, 1963

                                        8843

Eli Roshgold, General Manager
Telemusica, Ltd.
Room 148
Hotel Statler Hilton
32nd Street and 7th Avenue
New York, 1, New York

Dear Sir:—

With reference to your inquiry of November 4, 1963, multiplex receivers placed in subscribers' establishments by an FM broadcast station providing background music or other services under a Subsidiary Communications Authorization, are considered to be communications receivers rather than conventional broadcast receivers.

Unlike broadcast transmissions, FM multiplex transmissions are treated as privileged messages not subject to interception and use by persons not authorized by the sender—see Paragraph 19 of the enclosed Report and Order.

Very truly yours,

Ben F. Waple
Secretary

Enclosure

SIGNED BY ABOVE
MAILED BY
NOV 5 1963
MAILS & FILES     "

———◆———

We turn now to the sole question of whether or not S.C.A. receivers, which are designed and manufactured for reception of all transmissions permitted under the Subsidiary Communications Authorization, are subject to the excise tax imposed by section 4141, "Tax on Radio-Receiving Sets, Etc."

Section 4141, as amended by Excise Technical Changes Act of 1958, reads as follows:

"There is hereby imposed upon the sale by the manufacturer, producer, or importer of the following articles [including in each case parts or accessories therefor sold on or in connection with the sale thereof], a tax equivalent to 10 percent of the price for which so sold:

Radio receiving sets.

Automobile radio receiving sets

Television receiving sets.

Automobile television receiving sets

Phonographs

Combination of any of the foregoing.

Radio and television components.

Phonograph Records."

26 U.S.C.A. Section 4141 [1964 ed.], Sept. 2, 1958, Pub.L. 85–859, Title I, § 113[a], 72 Stat. 1278.

Section 4143, the companion section to section 4141, sets forth certain exemptions from the excise tax generally imposed on receivers.

*Exemption For Communication, Etc., Equipment*

[a] In general—"Except in the case of radio and television components and phonograph records, the tax imposed by section 4141 shall not apply to communication, detection, or navigation equipment of the type used in commercial, military or marine installations." 26 U.S.C.A., Section 4143 [1964 ed.] Sept. 2, 1958 Pub.L. 85–859, Title I, § 113[a], 72 Stat. 1278.

The above quoted statutory provisions were in effect during the tax years in question and control the disposition of this matter.

Also to be considered in reaching a decision are certain regulations which we now set forth:

"*Exemption of Communication, etc. Equipment*

[a] *Radio and television receiving sets, etc.* The tax imposed by section 4141 shall not apply to radio or television receiving sets, phonographs, or combinations of any of the foregoing *which are designed and manufactured for use primarily as communication,* detection, or navigation *equipment and are of the type used in commercial,* military, or marine *installations.* The following articles are illustrative of the type of articles which are exempt under this section:

[1] Radar equipment,

[2] Sonar equipment,

[3] Receivers for use in connection with ship-to-ship and ship-to-shore equipment, and

[4] Radio direction finding equipment [emphasis added] 26 C.F.R., § 48.4143–1."

We also pay heed to a Revenue Service advisory ruling which touches many of the legal issues involved in this action. Rev.Rul. 64–338, 1964–1 Cum.Bull. 426. In that advisory ruling the Service was of the opinion that FM multiplex radio receivers did not come within the scope of the excise tax exemption for "communication equipment". Its reasoning was summarized in the following one sentence:

"The described receivers and tuners are designed to receive radio programs which are broadcast for the pleasure of listeners, whereas the communication equipment contemplated by Section 4143 of the Code is designed primarily for use in the reception of voice or code messages as illustrated in the excise tax regulations.

We are fully aware that Congress has given the Secretary of the Treasury Department or his delegate the authority to prescribe all necessary rules and regulations for the enforcement of the Internal Revenue Code. 26 U.S.C. § 7805[a]. While we do not believe the aforementioned regulation, 26 C.F.R. 48.4143–1, to be legislative in character, it still is entitled to substantial weight and the language therein must be followed unless it is unreasonable and plainly inconsistent with the

revenue statutes. Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695; Lykes v. United States [1952], 343 U.S. 118, 127, 72 S.Ct. 585, 590, 96 L. Ed. 791; Commissioner of Internal Revenue v. South Texas Lumber Co. [1948], 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831. With respect to Revenue Rulings, however, they do not have the force and effect of Treasury Department regulations, but are certainly persuasive. Davis, 1 Administrative Law Treatise § 5.05, p. 332. If the aforementioned regulation and revenue ruling are valid several subissues must all be answered in the negative before the plaintiff may recover. Those subissues are: [1] Whether S.C.A. receivers are designed to receive radio programs which are transmitted for the listener's pleasure; [2] whether S.C.A. receivers to be considered as designed and manufactured for use primarily as communication equipment must be intended by the manufacturer to be used primarily for the reception of voice or code messages as illustrated in 26 C.F.R. 48.4143–1; and [3] whether S.C.A. receivers must be designed and manufactured for use primarily as communication equipment.

As we set out earlier in this opinion on page 8, infra, the Revenue Service ruled that S.C.A. receivers are designed to receive broadcasts for the *pleasure* of the listener. We suspect that the Revenue Service relied on the language of section 4141, as amended in 1955, rather than language of that Section, as amended in 1958. Section 4141 in 1955 imposed an excise tax on the manufacture of "entertainment-type" radio receiving sets. Even if the test for imposing excise tax on receiving sets had remained the same as the 1955 enactment, we would be compelled to find, from a reading of the prior act's legislative history in respect to what constitutes "entertainment-type", that the prior act basically intended to encompass only ordinary household AM or FM receiving sets. We further point out that the Revenue Ruling in question did not explicitly adopt the "entertainment-type" standard, but apparently equated that standard to the test it applied; "whether the S.C.A. receivers were designed to receive programs which are broadcast for the pleasure of listeners." If such a standard had any basis in law, which we believe it does not, it would seem that that test would have to read, whether the S.C.A. receivers were designed to receive programs which are *transmitted primarily* for the pleasure of listeners. The reason for adding the word "primarily" to the standard is that one can derive pleasure, for example, from a telephone conversation or by reading a ticker tape and, yet, no one would doubt that they are "communication equipment." We are convinced that functional music programs are not created primarily for the pleasure of the listener. We acknowledge the fact that some incidental pleasure may be derived therefrom. The primary purpose of functional music is to create a productive working environment. We further recognize that background music probably gives more direct pleasure to the listener. However, again, its primary purpose is to create a desired environment and is not transmitted for pleasure per se. Therefore, we hold that the Revenue Ruling was without basis in fact or law.

A more serious question is raised by the regulation as to whether S.C.A. receivers must be primarily used for the reception of voice or code messages in order to be considered as designed and manufactured primarily for use as communication equipment. It has been held that words used in a statutory provision for an exemption should be given their ordinary meaning. District of Columbia v. Mt. Vernon Seminary, D.C.1938, 69 App.D.C. 251, 100 F.2d 116; Helvering v. San Joaquin Fruit & Investment Co., [1936] 297 U.S. 496, 499, 56 S.Ct. 569, 570, 80 L.Ed. 824. The same would appear to be true with respect to regulations promulgated thereunder. "Communication" is defined in Webster's

New International Dictionary [3rd Ed. 1961] as—:

"2a: facts or information communicated b: a letter, note or other instance of written information 3a: obs: conversation, talk. 4. archaic: common participation 5a: b: communications pl: means of communicating [1]: a system [as telephones or telegraphs] for communicating information and orders [as in a naval service] [3]: the function in an industrial organization that transmits ideas, policies, and orders (4) c: a medium through which information is carried [channels of an industry] 6a: interchange of thought or opinions: a process by which meanings are exchanged between individuals through a common system of symbols [as language, signs, or gestures] b: . . . 8: or communications pl. but sing or pl. in const: an art that deals with expressing and exchanging ideas effectively in speech or writing through the graphic or dramatic arts * * * "

■ While a multiplicity of meanings is discussed in the above definition, we must, in light of the wording chosen by the Treasury Department in promulgating 26 C.F.R. 48.4143–1, hold that " * * * radio * * * receiving sets * * * which are designed and manufactured for use primarily as communications * * * equipment" means equipment to be used primarily for communicating information, orders, ideas, policies or opinions. If the wording of that regulation is valid, it would be the Courts' opinion that the S.C.A. receivers in question are subject to the excise tax.

■ The crux of the issue in this case, however, is whether the Treasury Department in construing section 4143 unduly limited the exemption intended by Congress by applying a "primary use" test rather than determining whether S.C.A. receivers and transmitters functionally constitute a communications equipment. It is clearly established that the power in the Treas-

ury Department to promulgate rules to effectuate the intent of the Code does not include the power to broaden or narrow the taxing provisions of a statute. Dixon v. United States, [1965] 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 233; Neuberger v. Commissioner of Internal Revenue [1940], 311 U.S. 83, 61 S.Ct. 97, 85 L.Ed. 58; Helvering v. Powers, 293 U.S. 214, 55 S.Ct. 171, 79 L.Ed. 291; General Elec. Co. v. Burton, [C.A.Ohio 1967], 372 F.2d 108; Land O'Lakes Creameries, Inc. v. Commodity Credit Corp., [8th Cir. 1959], 265 F.2d 163; Jones v. C. I. R., [C.A.La.1957], 242 F.2d 616; A & N Furniture & Appliance Co. v. United States, [D.C.Ohio 1967] 271 F.Supp. 40; Quaker City Iron Works, Inc. v. United States [D.C.Pa. 1966], 256 F.Supp. 450; Hampton Roads Indus. Electronics Corp. v. United States, [1959] 178 F.Supp. 474, 147 Ct. Cl. 635; Puig v. Tomlinson, [D.C.Fla. 1956] 143 F.Supp. 659; Fidelity-Philadelphia Trust Co. v. United States, [D. C.Pa.1954], 122 F.Supp. 551, aff. 222 F.2d 379; St. Louis Refrigerating & Cold Storage Co. v. United States, [1942], 43 F.Supp. 476, 95 Ct.Cl. 694; St. Paul Fire & Marine Ins. Co. v. Reynolds, [D.C.Minn.1942] 44 F.Supp. 863; Griswold v. United States, [D.C. Mass.1941], 36 F.Supp. 714, aff. 124 F.2d 599.

■ An administrative regulation which does not carry into effect the will of Congress is a nullity. Dixon v. United States, supra; United States v. Maxwell, [8th Cir. 1960] 278 F.2d 206; United States v. St. Paul Mercury Indem. Co., [D.C.Neb.1955], 133 F.Supp. 726, aff. 238 F.2d 594; Hanley v. United States, [1945], 63 F.Supp. 73, 105 Ct. Cl. 638. The plain words of the statute, together with the underlying purpose of the act are, of course, the source from which our findings of law must be made. District of Columbia v. Mt. Vernon Seminary, supra.; Helvering v. San Joaquin Fruit & Investment Co., supra.

The language in section 4143 states: "the tax [1] shall not apply to communi-

cation * * * equipment [2] of the type used in commercial * * * installations." If Congress had intended to exempt only radio receiving sets "which are designed and manufactured for use primarily as communication * * * equipment" it would have presumably said so. It could have done so by framing the statute in the manner in which the regulation reads or by an abundance of other ways. The present language of the statute imports a functional or mechanical definition to communication equipment, not a primary use definition. Furthermore, legislative history indicates that all radio receiving sets which are: [1] not of an entertainment nature; and, [2] used primarily in commercial installations are exempt from section 4141.

Section 4141 had its origin in section 3404 of the Revenue Act of 1941. Section 3404 provided:

> *"Tax on Radio Receiving Sets, Phonographs, Phonograph Records and Musical Instruments.* There shall be imposed upon the following articles * * * sold by the manufacturer * * * a tax equivalent to 10 per centum of the price for which sold:
>
> [a] Radio receiving sets, automobile radio receiving sets, combination radio and phonograph sets, and phonographs."

The tax on radio receiving sets was reenacted in section 4141 of the Revenue Act of 1954. Sections 4143 and 6416[b] [2] [G] at that time permitted a special credit or refund for communication receivers when sold to the United States Government couched in similar language to the exemption provided by section 4143, as amended 1958.

In August of 1955 the above sections were amended again. Section 4141 of the Internal Revenue Code of 1954 was amended by adding at the end thereof the following sentence:

> " 'Except in the case of radio and television components and phonograph records, the tax imposed by this section shall apply only to articles of the entertainment type' ".

Sections 4143 and 6416[b] [2] [G] of the 1954 Code were repealed. The Committee on Ways and Means in reporting the bill to the House stated in part:

> "The excise tax on radios, television sets, etc., would be limited under the bill to items of the entertainment type because your committee sees no reason for singling out for excise levy special communication, detection and navigation equipment used by business." 1955–2 Cum.Bull. 881, 883.

In 1958, Congress once again revised the portion of the manufacturers' excise tax act insofar as radio receiver sets is concerned. We have previously set out the wording of that section and its accompanying exemption section, supra. pp. 7 and 8 infra., of this memorandum. It is these sections of the Technical Changes Act of 1958 that are controlling in the present instance. The legislative history discloses that there were several reasons for the amendments enacted.

The bill is not concerned with general questions of excise tax rates or the desirability of adding or deleting entire tax categories.

> " * * * Both the Internal Revenue Service and taxpayers have had difficulty in determining what constitutes entertainment-type equipment, and, in fact, no satisfactory definition of the term 'entertainment type' has been evolved. The principal, initial reason for limiting the tax on radios * * * etc., to those of the entertainment type was the desire to exclude from tax that equipment which was of the communication, detection, or navigation type. Moreover, it is believed that the Service would have less difficulty in defining communication, detection, or navigation equipment, since at one time receivers of this type were free of tax when sold to the United

States Government." Rev.Acts 1954–60, Legislative History, pp. 799, 817.

The Senate Committee on Finance went on to state the effect of the tendered bill, H.R. 7125:

" * * * This bill restores this old exemption [under the 1954 Code] but extends it to such equipment when sold to any purchaser. * * * The new exemption is not necessarily limited, however, to equipment previously exempt, since the type of equipment purchased by the United States Government will not necessarily be the same as that purchased by private industry." Rev.Acts 1954–60, Legislative History, pp. 799, 817.

█ It is apparent to us that the 1958 Technical Changes Act did intend to delimit the breadth of the exemption somewhat by adding that communication equipment had to be of the type used in commercial installations. For example, "Amateur" radio receiving sets ["ham" radios] are no longer exempt. Rev.Rul. 61–26, 1961–1 Cum.Bull. 480. The basic purpose of the amendment, however, was to define "entertainment-type" in the negative by differentiating between radio receiving sets capable of tuning in public broadcasts and receiving sets capable of detecting and demodulating private radio transmissions, or i. e., point-to-point communications. We hold that the S.C.A. radio receiving sets manufactured by McMartin in the years in question, while often used to disseminate programs of a broadcast nature, constitute communication type equipment, and are not general broadcast receivers. We further hold that S.C.A. sets are of the type used in commercial installations.

The foregoing shall constitute the Court's findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure. Judgment will be in favor of McMartin. The I.R.S. shall take nothing under its counterclaim. Counsel for the plaintiff will prepare and submit a suitable order within fifteen [15] days.