CRABTREE, J.T.C.
Plaintiffs seek review in these consolidated proceedings of defendant’s determination of deficiencies in sales and use tax. The audit period for Maher Terminals, Inc. (Maher) covers calendar quarters in the years 1976, 1977 and 1978. The audit period for Zim-American Israeli Shipping Co., Inc. (Zim) embraces calendar quarters in the years 1976 through 1980. The transactions giving rise to the sales tax deficiencies involve Maher as vendor and Zim as vendee in all instances. In some *518 cases, both Maher and Zim have been assessed deficiencies with respect to the same transaction. The parties agree, however, that any duplication in deficiency assessments can be rectified by means of R. 8:9-3 computations. The use tax deficiency affects only Maher.
The issues common to both plaintiffs are (1) whether maintenance and repair services (M & R) rendered by Maher with respect to trailer chassis and ship containers owned or leased by Zim are exempt by reason of §§ 3(b)(2)(iii)[1] and 8(1)[2] of the Sales and Use Tax Act; (2) whether repair parts sold to Zim in connection with repairs to containers are exempt under § 8(1) of the act; and (3) whether taxation of such services and parts contravenes the Commerce Clause and equal protection provisions of the United States Constitution. The issues which affect only Maher are (4) whether parts sold in conjunction with repairs to chassis-container units are exempt under § 8(ff)[3] and (5) whether Maher’s use of a crane owned by the operator of an adjoining terminal is exempt from use tax as a casual sale within the purview of § 8(f).[4] The constitutional question is not implicated in the latter.
Maher’s Terminal Operations
Maher operates a marine terminal exclusively for container vessels at Port Elizabeth, New Jersey, under a long-term lease with the Port Authority of New York and New Jersey. Maher’s operations cover all services which a shipping line requires from a eontainership terminal. These services include the berthing of ships; stevedoring or the loading and unloading of *519 vessels; parking and storage of containers and chassis; moving containers on and off chassis; maintaining inventory of containers and chassis by number, size, type and ownership; moving of containers and chassis from various points throughout the terminal including movement through United States Customs; weighing of containers and cargoes; maintaining security of containers and cargoes within the terminal; loading and unloading of cargo from containers; inspection of containers and chassis for needed maintenance and repairs; and actual maintenance and repair of containers and chassis including maintenance of refrigeration units known as reefers. These services are provided pursuant to long-term contracts between Maher and its shipping line customers, who are obligated to use Maher’s terminal services exclusively, except that, the use of Maher’s maintenance and repair services is optional with each shipping line customer. Indeed, Zim relies on Maher’s repair facilities primarily for minor repair services which take 3V2 hours, on average, to complete. If repairs are estimated to require more than eight hours, Zim will send the containers to outside contractors. Zim sends its containers and chassis to several companies outside Maher’s terminal. These outside contractors limit their services exclusively to the repair of containers and chassis.
Containership terminals must be highly efficient in their operations since shipping lines, shippers, consignees and truckers are dependent upon efficient terminal performance. Many factors contribute to a terminal’s efficiency, including the number of ships that can be accommodated, the speed of the gantries, and the terminal’s maintenance and repair facilities. The availability of M & R facilities enhances efficiency by providing improved equipment utilization and control.
Maher never services ships on a casual basis; nor does it enter into agreements for single calls by containerships. It provides no services of any kind to the general public.
Maher provides all the cargo handling equipment, including the cranes. The shipping lines provide the containers and chassis.
*520 The foregoing is a general description of Maher’s activities and its contractual relations with its customers. A better understanding will be promoted by tracing the movement of containers designed for export or import.
On an export load a tractor pulling a container-carrying chassis enters the terminal. (The shipping line has previously notified Maher of the export load and has supplied the consignee with an empty container, which the consignee has loaded with cargo.) When the load enters the terminal, the trucker is given a dock receipt and a document known as a trailer interchange report (TIR). Maher checks the seals on the container, inspects the container and chassis for damage or mechanical problems, and records several items of information including identification numbers and any damage on the TIR. Any needed M & R work is then done. Then, the trucker parks the unit, separates his tractor from the container-carrying chassis, and leaves the terminal with or without a different chassis and container. When the containership is ready for loading, a yard hustler (a vehicle similar to a tractor) pulls the chassis and its container to a crane for loading the container on to the vessel.
On an import load the process is essentially reversed. Maher receives a manifest from the ship indicating what containers are to be discharged. The containers are then off-loaded from the ship by Maher’s cranes and placed on empty chassis, which are then parked for a few days awaiting the consignee’s truckers. When a trucker arrives he may be carrying an export load. Upon his arrival a TIR is prepared and the trucker is checked and cleared to pick up the container-carrying chassis, which is inspected before departure and repaired as needed.
In addition to its operations involving previously loaded containers, Maher has a facility known as a container freight station (CFS) at which Maher itself loads and unloads containers. This service is used by individual shippers who do not need an entire container for their cargo. Maher thus receives cargo from different shippers for packing into containers and it unloads containers carrying cargo for various shippers. Includ *521 ed in the CFS service is the storage of a shipper’s separate cargo before pick-up by a consignee.
Maher’s M & R services are of three general kinds: preventive maintenance, roadability and other repairs. Preventive maintenance on the chassis is performed while it is in the terminal awaiting its next move. Roadability is performed to make the chassis-container unit roadworthy in the course of delivering the unit to the consignee’s trucker. Roadability repairs are made at the exit lanes complex and are of such a nature that they can be completed within thirty minutes. Maher’s repair department has several vans with the tools and equipment necessary for M & R work and the vans are driven to the chassis and container to perform the work on the spot. Containers are always repaired while on a chassis. Maher does all its own M & R work in the terminal. It does not contract with other firms, nor does it permit other contractors to do repair work within the terminal.
No more than 5% of Maher’s total annual revenues are attributable to its M & R services. All of Maher’s services, including its M & R services, are separately billed. Separate billing expedites payment and assists cash flow, as it eliminates delay in payment for some services because of problems with or delay in the billing of other services. Furthermore, Maher’s shipping line customers, in the early days of their relationships with Maher, wanted itemized billings to afford them detailed information about the services rendered. Finally, Maher keeps separate revenue accounts for all its services, including M & R services.
Access to the Maher terminal is highly restricted, both for security reasons and in order to comply with United States customs laws and regulations.
The Containers
What fiber optics did for the communications industry, containerships have done for maritime commerce. With the advent of containerships and their custom-built containers, turn-around time, so vital to the prosperity of maritime shipping, has not *522 merely been reduced; it has been reversed. A containership spends approximately 72% of its time at sea, with 28% of its time spent in port, whereas general cargo ships, carrying break-bulk cargo, spent about 70% of their time in port, with only 30% at sea. The use of containers has exponentially increased the productivity of stevedores and the rest of the shore crew. In New York it takes a gang of 18 people only 10 hours to discharge 4200 tons from a containership. In contrast, it would take 60 people working around the clock in three gangs to discharge 2200 tons from a break-bulk vessel. Containers also protect the cargo stowed in them from damage caused by handling and from pilferage.
Containers are designed to serve the dual function of maritime carriage and overland transport of cargo in a virtually continuous journey from point of origin to point of destination.
Containerships are specially designed to carry containerized cargo. Each ship is divided into holds and bays. The holds are compartments in the ship’s structure divided by solid watertight bulkheads. A bay is a place to load containers in the hold; each bay is the length of a container and will accommodate one container. A containership can carry containers both below deck and above deck. Below deck the containers are loaded into four cell guides, which are vertical corner arrows extending from the tank top to the deck. These cell guides hold the container and keep it from moving. The containers are generally stacked seven deep below deck and four deep above deck. They can also be loaded 13 abreast.
Cell guides are not used above deck. Instead, corner locks or twist locks which fit small cavities built into the container corner posts are welded onto the hatch. These fittings are locked after the container is placed upon them. Then the containers are stacked upon one another. After the containers are stacked, they are tied with lashing ropes so they will be better able to withstand the stresses at sea. The cell guides are for the most part designed to accept 40-foot containers. Some bays, however, are also suitable for 20-foot containers.
*523 Containers are constructed to withstand the stresses of a sea voyage. The strength of the container is built into its frame, the strongest points being in the corner posts. The corner posts must be strong enough to withstand not only the dynamic stresses caused by the pitching and rolling of the ship but also the 30 tons of pressure exerted during movement of the containers by shore cranes in the process of loading or unloading. They must also have the strength to enable each container to support the weight of six other containers, weighing up to 30 tons each, stacked on top of it.
The corner fittings and locking devices heretofore referred to are designed to permit stacking of the containers below deck. The corner fittings on the top of the corner post are designed to fit into the spreader bar used in conjunction with the shore crane when the container is being loaded and unloaded. Finally, the corner fittings are used to attach the container to a chassis for land transport. The container is locked to the chassis by a lever mechanism.
Chassis used to carry containers are so constructed as to be unadaptable to any other use. They are not flat-bed trailers; they are designed to receive cargo containers and nothing else. A containership costs, on average, $50,000,000 and is equipped to carry between 800 and 1,000 containers, depending upon its size. Each container carries approximately 20 tons of cargo on average. Each containership, thus, carries 16,000 to 20,000 tons of cargo when fully loaded.[5] The carrying capacity of a general cargo vessel, on the other hand, is limited to 12,000 tons.
Containers can be and sometimes are carried on general cargo ships to ports that do not have containership terminals. These containers are loaded and unloaded by the general cargo ship’s own on-board cranes, a fact which limits the tonnage *524 carried in the containers, as those cranes do not have the lifting capacity of the cranes located at containership terminals such as Maher’s terminal.
Furthermore, the general cargo vessels can accept no more than 77 containers (compared to the minimum of 800 fully-loaded containers carried by a containership). Conversely, a containership can theoretically be used as a general cargo vessel but only a small amount of break-bulk cargo can be carried at the bottom of a containership’s hold, as there is no place to lash or otherwise secure the cargo.
Another difference between a containership and a general cargo vessel is that the latter have ’tween decks. The ’tween deck, which divides the holds into horizontal compartments, is necessary to prevent the cargo at the bottom of the hold from being crushed by the cargo loaded above it. A containership has no ’tween deck. On a containership up to nine containers can be stacked one on top of another and still withstand all the movements of the ship; under these circumstances, ther.e is no need for a ’tween deck.
When a shipping line orders a new containership, it simultaneously orders enough containers to operate the ship. Three sets of containers are needed: one set at the point of origin, a second set for the destination port and a third set for carriage aboard the vessel.
Containerships are constructed to carry containers only; and without containers these ships simply cannot function. The containers are thus an integral part of a containership, which cannot be converted to any other use or purpose. The integration of the containers with the ship is more than physical; it is also economic and functional. The ships themselves are designed for certain cargoes and for certain routes. They cannot economically be shifted to other trades or other routes.
Maher’s Use of a Crane Owned by the Operator of an Adjoining Terminal
.During the audit period, Maher entered into a written contract with Sea-Land Service, Inc., the operator of an adjoining *525 containership terminal, for the use of the latter’s cranes for moving cargo containers. Under this contract, which was terminable only upon 18-months advance notice, Maher could use a Sea-Land crane for a consideration of $250 an hour. The purpose of the contract was to provide Maher with additional cranes as Maher’s business required. Sea-Land only leased its cranes to Maher, as the cranes were mounted on tracks which only extended to Maher’s facility adjacent to Sea-Land. During the audit period, Sea-Land invoiced Maher for the use of its cranes on 22 dates in 1976, 12 dates in 1977 and 16 dates in 1978. Maher paid a total of $164,625 for 658.5 hours of crane usage.
The § 3(b)(2)(iii) Exemption Issue
Section 3(b)(2)(iii) provides that maintenance and repair services “rendered with respect to trucks, tractors, trailers or semitrailers by a person who is not engaged ... in a regular trade or business offering such services to the public” are exempt from sales tax. The first point of inquiry here is whether Maher’s M & R services performed on its customers’ chassis constitute a regular trade or business. If that question is answered in the negative the exemption applies and further inquiry as to whether Maher offers such services to the public need not be pursued.
 The court is aware that, as defendant argues, exemption claims are strictly construed against the claimant, Princeton University Press v. Princeton, 35 N.J. 209, 172 A.2d 420 (1963); and that the legislative intent to provide the claimed exemption must be clearly and unmistakably expressed, with ambiguities resolved against the exemption. Body-Rite Repair Co. v. Taxation Div. Director, 89 N.J. 540, 446 A.2d 515 (1982), rev’g 178 N.J.Super. 263, 428 A.2d 940 (App.Div.1981); MacMillan v. Taxation Div. Director, 180 N.J.Super. 175, 434 A.2d 620 (App.Div.1981), aff’d o.b. per curiam 89 N.J. 216, 445 A.2d 397 (1982). This stern dictum is ameliorated, however, by the equally salutary principle that strict construction must never be permitted to defeat the evident legislative design, nor does *526 strict construction mean a construction that begrudges. Deubel v. Kervick, 33 N.J. 568, 166 A.2d 561 (1960); Princeton Tp. v. Tenacre Foundation, 69 N.J.Super. 559, 174 A.2d 601 (App.Div.1961).
Moreover, the paramount goal of all statutory construction, to which all other rules of construction are subordinate, is the implementation of the apparent legislative purpose, Clifton v. Zweir, 36 N.J. 309, 177 A.2d 545 (1962); and in this connection, particularly when taxation or exemption therefrom is involved, the best approach is to give the words used in the statute their ordinary and generally accepted meaning. Public Service Elec. & Gas Co. v. Woodbridge Tp., 73 N.J. 474, 375 A.2d 1165 (1977); International Business Mach. Corp. v. State, 141 N.J.Super. 79, 357 A.2d 292 (App.Div.1976). The critical phrase to be defined is “regular trade or business.” The act provides no definition of that phrase so we must look elsewhere for its meaning. The primary definition of “business,” according to Webster’s Deluxe Unabridged Dictionary, Second Edition, is: “employment, occupation; profession; calling; vocation; means of livelihood; that which occupies the time, attention and labor of men, for the purpose of profit or improvement; as his business was that of a merchant; the business of a banker.” Emphasis in original. The adjective “regular” is defined in the same source as “recurring or functioning at fixed or uniform intervals.”
Thus, a “regular business” presupposes a dominant activity conducted on a recurring basis at fixed intervals. Maher’s dominant business is stevedoring and related marine terminal activities conducted, according to contract, at specified times, i.e. whenever one of its customer’s containerships is berthed. M & R services may or may not be performed at those times or, for that matter, at any other time. In addition, only minor repairs are performed by Maher, major work being done by outside contractors on premises other than Maher’s terminal. While Maher provides a comprehensive array of terminal services to its customers, who are contractually obli *527 gated to use those services exclusively, Maher’s M & R services, which are available only to its shipping line customers, are availed of at the sole discretion of those customers. Maher’s annual revenues from M & R services amount to a mere 5% of its total revenues.
Thus, while M & R services promote the overall efficiency of Maher’s terminal and stevedoring operations, and, for that reason, are demanded by the shipping lines, such services are merely ancillary and subordinate to the terminal and stevedoring operations.
While there would appear to be a dearth of judicial precedent on this point the case of International Business Mach. Corp. v. State, supra, is instructive. There, IBM operated a number of branch offices in New Jersey which it used primarily for administrative and marketing activities. These offices, however, also sold small office products such as business forms, typewriter ribbons and similar items, as an accommodation to IBM’s customers. The sale of these office supplies generated only 8/io of 1% of IBM’s total sales revenues in New Jersey. The State argued that these sales transformed the branch offices into “factory outlets,” subject to the retail gross receipts tax. The Appellate Division rejected this contention, holding that these incidental retail sales, made as an accommodation to IBM’s customers, did not alter the essential character of the branch offices as administrative and marketing centers.
In like manner, the limited repair services offered by Maher on an ad hoc basis to its shipping line customers — and only to those customers — as an accommodation does not transform Maher from a stevedoring and terminal operating company into a container-chassis repair facility.
In view of the foregoing I conclude that Maher is not engaged in the regular trade or business of offering M & R *528 services to the public[6] and, accordingly, Maher’s M & R services performed on its customers’ chassis are exempt from sales tax pursuant to § 3(b)(2)(iii) of the act.
Exemption of M & R Services Performed on Cargo Containers
As noted above, the primary objective of all statutory interpretation is the implementation of the apparent legislative purpose. Clifton v. Zweir, supra. In this case, the determination of the legislative purpose is difficult since containers were only introduced on the Atlantic route in 1966 and did not become widely adopted until a few years later. See Tombari, “Trends in Oceanborne Containerization and its Implications for the U.S. Lines Industry,” 10 J. Maritime Law & Commerce, 311, 313 (1979). The original Sales and Use Tax Act was not enacted until 1966. L. 1966, c. 30. Thus, widespread use of containerships could not have been foreseen by the Legislature when the act was adopted. As originally enacted § 8(0 of the act provided, pertinently:
Sales, repairs, alteration, or conversion of commercial ships, barges and other vessels of 50-ton burden or over, primarily engaged in interstate or foreign commerce, ... and property used by or purchased for the use of such vessels for ... maintenance and repairs ... are exempt from the tax imposed under the ... Act.”
As will be seen, the quoted statute made no provision for containerships or containers.
While neither containerships nor their cargo containers were in widespread use when the Sales and Use Tax Act was passed, the narrow issue before the court is the treatment under § 8(1) of cargo containers. The characterization of the containerships themselves as commercial ships or vessels of 50-ton burden engaged in interstate or foreign commerce is not in dispute.
Our courts recognize that when a development arises that was not anticipated by the Legislature the judiciary must *529 sympathetically respond with an interpretation of the statute in harmony with the presumed legislative intent. New Capitol Bar & Grill Corp. v. Div. of Employment Sec., 25 N.J. 155, 135 A.2d 465 (1957); N.J. Builders, Owners and Managers Association v. Blair, 60 N.J. 330, 288 A.2d 855 (1972). In the New Capitol Bar case our Supreme Court said:
It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end “words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms.” [25 N.J. at 160, 135 A.2d 465; citations omitted]
As Justice Holmes so felicitously put it:
A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used. [Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1917)].
The eminent legal scholar, Professor Karl Llewellyn, aptly described the task facing the courts in these situations:
Here the quest is not properly for the sense originally intended by the statute, for the sense sought originally to be put into it, but rather for the sense which can be quarried out of it in light of the new situation. Broad purposes can indeed reach far beyond details known or knowable at the time of drafting. A “dangerous weapon” statute of 1840 can include Tommy guns, tear gas, or atomic bombs. “Vehicle" in a statute of 1840, can properly be read, when sense so suggests, to read an automobile, or a hydroplane that lacks wheels. But for all that, the sound quest does not run primarily in terms of historical intent. It runs in terms of what the words can be made to bear, in making sense, in the new light of what was originally unforseen. [Llewellyn, The Common Law Tradition: Deciding Appeals 374 (1960); emphasis in the original]
Cargo containers are functionally part of a containership by all pragmatic criteria. Indeed, they are nothing more than smaller and movable versions of the holds in general cargo ships. See Northeast Marine Terminal Co., Inc. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); Leather’s Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2 Cir.1971); Mitsui & Co., Ltd. v. American Export Lines, 636 F.2d 807 (2 Cir.1981). This complete integration is shown by the facts hereinabove found. The enormous carrying capacity of a con *530 tainership, more than double the capacity of a general cargo vessel, is wholly dependent for its maximum utilization upon cargo containers specially manufactured for carriage on containerships. A containership carrying break-bulk cargo is not an economically viable enterprise. As a containership has no ’tween decks, its break-bulk cargo is limited to that which can be stowed in the ship’s bottom. By the same token, containers are not suitable, nor are they made, for carriage aboard general cargo vessels. While such carriage is theoretically possible it represents a highly inefficient use not only of the break-bulk vessel’s cargo capacity but of the containers as well. No more than 77 containers, loaded below capacity, can be carried on a general cargo vessel compared to the 800 to 1,000 fully loaded containers which can be carried on containerships.
These facts, together with the reversal of turnaround time and the significant increase in productivity of the shore crews, lead ineluctably to the conclusion that the containers are an integral, indispensable part of a containership and that such integration is not only physical; it is economic and functional as well. To be sure, the containers are built for overland transport, on specially built chassis, as well as maritime carriage. This adaptability to intermodal transport, however, does not render the containers any less indispensable to the economic viability of containerships. Simply put, without the containers, there would be no containerships.
Support for the proposition that cargo containers are considered component parts of a containership for tax purposes is found in a pronouncement of the Internal Revenue Service, the agency of the U.S. Government charged with administration of tax laws for over 70 years. In Rev.Rul. 60-185, 1960-1, C.B. 412 the service ruled that cargo containers designed for shipment of property by water, rail and highway did not constitute truck trailer and semitrailer bodies within the purview of the manufacturer’s excise tax imposed by § 4061(a)(1) of the 1954 Internal Revenue Code as the containers were not primarily designed for highway use, although incidental highway use *531 may occur. While this Ruling is not binding upon the courts, it is persuasive and is entitled to some weight in the judicial interpretative process. McMartin Industries v. Vinal, 441 F.2d 1274 (8 Cir.1971), aff’g 301 F.Supp. 749 (D.Neb.1969). See Avis Rent A Car System, Inc. v. United States, 364 F.Supp. 605 (E.D.N.Y.1973).
Defendant points to the case of Sea-Land Service, Inc. v. County of Alameda, 12 Cal.M 772, 117 Cal.Rptr. 448, 528 P.2d 56 (Sup.Ct.1974), which appears to be the only reported decision in which a court declined to treat containers as part of a containership. In that case, the California Supreme Court upheld a local ad valorem property tax imposed upon the containers on the basis of their continuous presence in the taxing jurisdiction. Quite apart from the fact that this court is not bound to follow the decisions of courts in other states, First Nat. Bank of Lyndhurst v. Bianchi & Smith, Inc., 106 N.J.Eq. 333, 150 A. 774 (Ch.1930), the Sea-Land case is distinguishable. There, the taxable event was the presence of the property within the taxing jurisdiction. Thus, the applicability of the tax depended upon the container’s situs and not its function. In Sea-Land a steady stream of containers remained in the taxing district throughout the entire year. In contrast, New Jersey’s sales tax is an excise, or transaction, tax, the applicability of which depends upon either the nature of the transaction or the function of the property involved in the transaction. The incidence of the tax does not depend upon the location of the property. Thus, the central concern of the California Supreme Court in Sea-Land, namely, the situs of the movable property, is not at issue in this case. The central issue in this aspect of the case is the function of containers and their relationship to the containerships.
The next aspect of this issue to be addressed is the effect of the amendment of § 8(1) by L. 1979, c. 291, effective January 14, 1980, whereby the exemption for repairs to commercial vessels was explicitly extended to cargo containers.
*532 Defendant argues that the amendment presumptively changed prior law, thus leading to the conclusion that it was not the legislature’s intention to exempt cargo containers when § 8(1) was originally enacted. To be sure, an amendment to a statute is presumptively indicative of a substantive change in the law. Nagy v. Ford Motor Co., 6 N.J. 341, 78 A.2d 709 (1951); Airwork Service Division v. Taxation Div. Director, 2 N.J.Tax 329, 346-347 (Tax Ct.1981), aff'd o.b. per curiam 4 N.J.Tax 532 (App.Div.1982), certif. granted 93 N.J. 246, 460 A.2d 656 (1983); 1A Sutherland, Statutory Construction (4 ed. 1972), § 22.30 at 178. Furthermore, a statute is not applied retroactively unless the intention be clearly manifested by the Legislature. Kopczynski v. Camden County, 2 N.J. 419, 66 A.2d 882 (1949); Riteway Rentals, Inc. v. Director, Division of Motor Vehicles, 2 N.J.Tax 117 (Tax Ct.1981). See State, Dept. of Environ. Protect, v. Ventron Corp., 94 N.J. 473, 498, 468 A.2d 150 (1983). Cf. Seatrain Lines v. Edgewater, 94 N.J. 548, 468 A.2d 197 (1983) (statute expressly applicable to all proceedings pending on date of enactment).
It is also true, however, that courts may look to an amendment of a statute as an aid in ascertaining the legislative intent underlying the original enactment. Matawan Boro. v. Monmouth Cty Tax Bd., 51 N.J. 291, 240 A.2d 8 (1968). Moreover, courts have recognized that legislatures often amend statutes, not to change the prior law, but merely to clarify it and make more specific a right which had theretofore existed. In re Suspension of Heller, 73 N.J. 292, 374 A.2d 1191 (1977). See J. C. Chap. Prop. Owner’s etc. Assoc. v. City Council, 55 N.J. 86, 95, 259 A.2d 698 (1969). A review of the legislative history of L. 1979, c. 291 will demonstrate the applicability of these principles to the case before the court.
Beginning in 1974, bills were introduced in the legislature to amend § 8(1) to include explicitly within the exemption, repairs to cargo containers. See, e.g., Assembly Bill 1860 (1974), Senate Bill 1048 (1976) and Assembly Bill 1055 (1978). Appended to these bills were similar statements explaining the *533 purpose and rationale for the amendment. The Senate Revenue, Finance and Appropriations Committee declared in its June 20, 1977 statement to Senate Bill 1048:
With the evolution of container ships, in place of break-bulk commercial ships, the cargo container is recognized as an integral and component part of the ship and should therefore be exempt to the same extent as is the ship itself.
Similarly, the Sponsor’s Statement to Assembly Bill 1055 explained:
The statute as enacted [L. 1966, c. 30], however, overlooks the technological revolution which has occurred in the ports of New Jersey in the sense that the break-bulk commercial ships have all been replaced by container ships, an integral and component part of which is the container itself. The commercial container ship is functionless without the container and in many instances the container forms the bulkhead of the ship. This amendment clarifies the words “commercial ships” used in the statute so as to include cargo containers and the container ships that are now in use in the ports of New Jersey. [Emphasis supplied]
The operative language of Senate Bill 1048 amending § 8(1) is identical to the operative language in Assembly Bill 1055, which was ultimately enacted as L. 1979, c. 291.
The court draws two conclusions from this legislative history. First, the inclusion of repairs to containers within the exemption is wholly consistent with the policies underlying the original enactment. As the Senate Revenue, Finance and Appropriations Committee observed in its statement accompanying Senate Bill 1048, since containers are an integral part of a ship, they should be exempt to the same extent as the ship. Secondly, L. 1979, c. 291 did not create a new exemption, but merely clarified the meaning of the initial exemption. The sponsor’s statement to Assembly Bill 1055 declares that the purpose of the amendment is to provide a clarification of the term “commercial ships.”
The final point to be addressed in this phase of the case is defendant’s argument that its longstanding interpretation of § 8(1), prior to its amendment by L. 1979, c. 291, that cargo containers were not covered by the exemption accorded commercial ships is entitled to great weight, citing State v. LeVien, 44 N.J 323, 209 A.2d 97 (1965) and J.B. Williams, Inc. v. Glaser, 114 N.J.Super. 156, 275 A.2d 447 (App.Div.1971). De *534 fendant also urges that the numerous statutory amendments to § 8 over the years without disturbing the language of § 8(1) lends additional weight to his interpretation, citing Automatic Merchandising Council v. Glaser, 127 N.J.Super. 413, 317 A.2d 734 (App.Div.1974), Body-Rite Repair Co. v. Taxation Div. Director, 89 N.J. 540, 446 A.2d 515 (1982) and other cases. The counterweight to this position is that the interpretation of a statute by an administrative agency, while it may be entitled to some weight, is not conclusive and a court is not bound by an agency’s construction. Service Armament v. Hyland, 70 N.J. 550, 362 A.2d 13 (1976).
The administrative rulings in question merely state defendant’s conclusion that cargo containers are not embraced by the § 8(1) exemption. They are not supported by a statement of reasons beyond the conclusionary observation that the containers are not a component part of the ship. Moreover, defendant’s witness was unable to point to any legislative history in support of defendant’s administrative rulings on the issue; nor was defendant’s witness able to explain how — or whether — the rulings took into account the technological changes undergirding the container revolution. This lack of credibility, together with the failure of the rulings themselves to support the conclusion therein reached regarding tax treatment of the containers, effectively strip the rulings of any efficacy. A court is not bound to accord any weight to administrative rulings when the agency’s position is not a reasoned interpretation of the statute. Whirlpool Corp. v. Marshall, 445 US. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980); Levine v. Fairleigh Dickinson University, 646 F.2d 825 (3 Cir.1981).
Finally, defendant’s persistence in his administrative interpretation for many years while other parts of the exemption statute were amended by the Legislature is without significance. As the Appellate Division declared in Gladden v. Pub. Emp. Retirement System Trustee Bd., 171 N.J.Super. 363, 409 A.2d 294 (App.Div.1979):
*535 While it is true that an agency’s construction of a statute administered by it over a period of years without legislative interference will under appropriate circumstances be granted great weight as evidence of its conformity with legislative, intent, Malone v. Fender, 80 N.J. 129, 137 [402 A.2d 240] (1979), it is equally true that long continued error does not make valid what is clearly invalid, [at 374, 409 A.2d 294; citations omitted; emphasis supplied]
In view of the foregoing I conclude that the maintenance and repair of the cargo containers, together with the parts used in conjunction therewith are exempt from sales tax for all quarters included in the audit periods involved, pursuant to § 8(1) of the act.
The § 8(ff) Exemption for Sale of Repair Parts Used in Conjunction with Chassis Repairs
Maher claims exemption pursuant to § 8(ff) for 1978 sales of parts used in conjunction with repairs to chassis and containers.
The relevant statute, enacted as L. 1977, c. 217 and effective January 1, 1978, amends § 8 to exempt
(ff) Sales, renting or leasing of: commercial motor vehicles, and vehicles used in combination therewith, as defined in R.S. 39:1-1 and registered in New Jersey for more than 18,000 pounds; or which are operated pursuant to a certificate or permit issued by the Interstate Commerce Commission; and repair and replacement parts therefor.[7]
This claim is an alternative contention as far as repair parts for the cargo containers are concerned. That issue has been resolved in favor of plaintiffs. The balance of the issue, namely, whether Maher’s 1978 sales of parts used in conjunction with chassis repairs are exempt, must be resolved in defendant’s favor for want of sufficient proofs.
The parties have stipulated that a chassis and tractor constitute a commercial motor vehicle; that chassis may be separately registered in New Jersey, although not by weight; that the registration fee for tractors is based upon the weight of a fully loaded vehicle, which, in this case is the combined weight of the *536 tractor, the chassis and a fully loaded container. If registered in New Jersey, the tractor would be registered for more than 18,000 pounds. (The court has previously found that cargo containers carry 20 tons.) Operating certificates are issued by the ICC to the motor carrier, i.e., the truck or tractor operator, not to the owner of the trailer or chassis. 49 U.S.C.A. §§ 306, 309. Thus, Maher’s eligibility for exemption under section 8(ff) for the sale of parts used in chassis repairs depends upon proof of New Jersey registration of the chassis involved. No such proof was offered. Maher bears the burden of proof in this regard. Kollinger Estate v. Taxation Div. Director, 4 N.J.Tax 652 (Tax Ct.1982).
Maher’s Use of Sea-Land’s Crane as a Casual Sale
Maher contends that its use of Sea-Land’s crane upon 22 dates in 1976, 12 dates in 1977 and 16 dates in 1978 for a total of 658.5 hours of usage constitutes a casual sale exempt under § 8(f). Maher paid Sea-Land a total of $164,625. The transaction constitutes a sale for purposes of the act. N.J.S.A. 54:32B-2(f). “Casual sale” is defined in § 2(u) as “an isolated or occasional sale.”
Both Maher and defendant resort to dictionary definitions to support their mutually exclusive positions. These definitions are of little help in resolving the issue. Suffice it to say that Maher’s use of Sea-Land’s crane upon 50 occasions over a three-year span, about once every three weeks, is neither isolated nor occasional. The transactions occurred with regularity as part of a pattern or practice and in accordance with the terms of a written agreement. The fact that Sea-Land leases its crane only to Maher is irrelevant, as use of the crane by anyone but Sea-Land or Maher is physically impossible.
Accordingly, the court concludes that Maher is liable for a tax on its transactions with Sea-Land, whether it be a sales tax imposed upon the vendee pursuant to N.J.S.A. 54:32B-14(b) or a compensating use tax imposed pursuant to N.J.S.A. 54:32B-6(A).
*537 The court’s construction of the provisions of the Sales and Use Tax Act relevant to the disposition of the issues makes it unnecessary to address the constitutional questions raised by plaintiffs.
The parties will submit computations pursuant to R. 8:9-3, following which judgment will be entered.

N.J.S.A. 54:32B-3(b)(2)(iii).

N.J.S.A. 54:32B-8(7), redesignated as N.J.S.A. 54:32B-8.12 by L. 1980, c. 105, effective September 11, 1980.

N.J.S.A. 54:32B-8(ff), now N.J.S.A. 54:32B-8.31.

N.J.S.A. 54:32B-8(f), redesignated as N.J.S.A. 54:32B-8.6. Hereinafter throughout, unless the context requires otherwise, the various subsections of § 8 will be cited as they appeared during the audit periods prior to the redesignation effected by L. 1980, c. 105.

There is no correlation between a cargo's spatial displacement and its weight. Hence, a container may carry more than 20 tons of cargo and a containership's load capacity may reach 25,000 tons.

The conclusion that Maher is not engaged in the regular trade or business of offering M & R services makes it unnecessary to decide whether those services are offered to the public.

The statute was further amended by L. 1979, c. 291, effective January 14, 1980 to require both New Jersey registration and operation under an ICC permit.