Filed 6/11/26

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KENNETH DOSS,<br><br>        Plaintiff and Respondent,<br>v.<br>TESLA, INC.,<br><br>        Defendant and Appellant. | A173210<br><br>(Alameda County<br>Super. Ct. No. 24CV079309) |

The Federal Arbitration Act (9 U.S.C. § 1, et seq.) (FAA) governs arbitration provisions in contracts that involve interstate commerce but exempts from its coverage the "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1 ("section 1").) We consider whether "yard hostlers" employed by defendant Tesla, Inc. (Tesla) to move 53-foot trailers containing auto parts shipped from out of state around Tesla's factory grounds are a class of workers engaged in interstate commerce for purposes of this exemption.

Plaintiff Kenneth Doss is a former yard hostler for Tesla who filed a putative class action against the company for wage and hour violations. In denying Tesla's motion to compel arbitration of these claims, the trial court

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of parts C and D of the Discussion.

1

concluded (1) the parties' arbitration agreement was exempt from the FAA because yard hostlers are "transportation workers" engaged in interstate commerce within the meaning of section 1; (2) Labor Code section 229 (which permits the court to disregard an arbitration agreement in certain wage actions) rendered the arbitration agreement ineffective as to nearly all of the causes of action in the complaint; (3) the class waiver provision was invalid under the four-factor test set forth in *Gentry v. Superior Court* (2007) 42 Cal.4th 443 (*Gentry*); and (4) severance of the class waiver was not appropriate because the arbitration agreement was tainted with illegality.

In the published portion of our opinion, we conclude the trial court did not err in finding Doss and the putative class members exempt from the FAA under section 1. Although Tesla's yard hostlers perform their work entirely within the confines of Tesla's factory grounds, they are "transportation workers" engaged in interstate commerce because their movement and positioning of 53-foot trailers for unloading and receiving is a necessary step in the completion of the interstate journey of the auto parts. Having determined the FAA does not apply in this case, we further conclude the trial court erred in ruling that Labor Code section 229 rendered the arbitration agreement ineffective as to Doss's causes of action for overtime violations, meal and rest break violations, and wage statement violations, as those are not actions for collection of due and unpaid wages within the scope of the statute. In the unpublished portion of our opinion, we conclude the court did not err in refusing to invalidate the class waiver provision under *Gentry*, but we agree with Tesla that the court's decision not to sever the waiver provision was based in part on legal error. We remand for the court's determination in the first instance of unconscionability issues that were briefed but not addressed below.

## FACTUAL AND PROCEDURAL BACKGROUND

Doss filed suit against Tesla in superior court on behalf of himself and a putative class of similarly situated Tesla employees for violations of the Labor Code and the Unfair Competition Law (Bus. & Prof. Code, § 17200) (UCL) relating to wages, meal and rest periods, wage statements, and business expense reimbursements. Doss alleged he was employed by Tesla between 2017 and 2021, first as a materials handler and then as a yard hostler at Tesla's distribution center in Fremont, and his complaint defined the putative class as all current and former yard hostlers, material handlers, and other nonexempt, hourly employees who "handled packages and goods as part of international and/or interstate commerce" during the class period.

Tesla moved to compel Doss to arbitrate his claims on an individual basis. In support of the motion, Tesla submitted the declaration of its recruiting manager Ben Flesch, who averred that Doss had electronically signed an offer letter containing an arbitration provision (the "arbitration agreement") in which he purportedly agreed that "any and all disputes, claims, or causes of action, in law or equity, arising from or relating to [his] employment, or the termination of [his] employment, will be resolved, to the fullest extent permitted by law by ***final, binding and confidential arbitration*** in [his] city and state of employment conducted by the Judicial Arbitration and Mediation Services/Endispute, Inc." The arbitration agreement further stated in subparagraph (a) that any such claims "must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding," and, in subparagraph (c) that the "arbitrator shall not have the authority to consolidate the claims of other employees and shall not have the authority to

fashion a proceeding as a class or collective action or to award relief to a group or class of employees in one arbitration proceeding[.]"

Tesla also submitted the declaration of human resources manager Tatiana Cadle, who explained Doss worked as a yard hostler at the "Fremont Factory," which is a manufacturing facility for Tesla vehicles. In Cadle's words, "the primary role of Yard Hostlers is to support the production of Tesla's vehicles. Yard Hostlers use tractor trucks to move trailers within the confines of Tesla's truck yard at its Fremont Factory that contain component parts Tesla uses to assemble and manufacture its vehicles. While Yard Hostlers in California handle materials and parts used for production, they are not responsible for shipping, receiving, or delivering Tesla's finished vehicles or other products. Yard Hostlers play no role in transporting goods across state or international borders."

Attached to Cadle's declaration was a job description setting forth the duties of Tesla's yard hostlers, which includes driving trucks or tractors "to and from vehicle parking and docking area to move, position, and park 53' trailers" in order "to facilitate shipping and receiving functions." Hostlers also "[m]ove production material trailers on request to fulfill the just-in-time delivery method"; "ensure all trailers are loaded or empty"; inspect trucks and trailers for safety and maintenance issues; and complete daily yard checks.

Doss opposed the motion, arguing he was exempt from the FAA because Tesla's yard hostlers are workers engaged in interstate commerce for purposes of section 1. In his supporting declaration, Doss explained his "duties as a Yard Hostler included driving a truck carrying car parts arriving from other warehouses and distribution centers, included [*sic*] arriving from out of state. I would transport the arriving goods to the warehouse dock,

4

where the parts would then be unloaded in the warehouse and used to build Tesla vehicles per customer orders. I also conducted safety inspections and verified the trucks were properly loaded and unloaded. The parts and other goods I transported often originated outside of California. I was able to see the out-of-state addresses on the shipping labels, and knew for example, that some battery parts for the cars arrived from Nevada."

Doss additionally contended that since the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) rather than the FAA is applicable, Labor Code section 229 renders the arbitration agreement ineffective as to all of his claims, and the class waiver provision is unenforceable under the test established in *Gentry*, *supra*, 42 Cal.4th 443. He also argued the arbitration agreement was procedurally and substantively unconscionable.

The trial court denied Tesla's motion to compel arbitration. Though finding an arbitration agreement existed, the court concluded the FAA did not apply because Doss was a transportation worker engaged in interstate commerce within the meaning of section 1. While yard hostlers like Doss did not themselves transport goods across state lines, the court reasoned "[t]he flow of commerce does not stop at the loading dock door. The final step over the threshold—actually receiving the product—that has traveled from elsewhere is still part of the flow of commerce." "In sum, [Doss's] role was at Tesla's end of the stream of commerce, bringing parts into the facility and then moving them where they needed to go."

Turning to California law, the trial court concluded Labor Code section 229 rendered the arbitration agreement ineffective as to seven of Doss's eight causes of action, but not his seventh cause of action for unreimbursed business expenses. As to the class waiver provision, the court found there was "modest" procedural unconscionability because Doss was required to

5

accept this term as a condition of employment. The court further found the class waiver provision was contrary to California public policy under the *Gentry* test, and the court declined to sever the unenforceable provision. Accordingly, the court concluded the arbitration agreement was unconscionable and denied the motion to compel in its entirety.

Tesla appealed.

## DISCUSSION

On a motion to compel arbitration, the moving party bears the burden of proving the existence of an arbitration agreement, and the opposing party bears the burden of proving any defense to enforcement, such as unconscionability. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) The opposing party also shoulders the burden of demonstrating whether an exemption to the FAA applies. (*Betancourt v. Transportation Brokerage Specialists, Inc.* (2021) 62 Cal.App.5th 552, 559 (*Betancourt*).) Because FAA applicability is a question of law, we review the trial court's determination on this question de novo. (*Id.* at p. 559.)

### A. FAA Exemption under Section 1

The FAA exempts from its coverage the employment contracts of "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) In *Circuit City Stores v. Adams* (2001) 532 U.S. 105 (*Circuit City*), the United States Supreme Court held that section 1 exempts only "transportation workers," not all employees; that the statutory language " 'engaged in foreign or interstate commerce' " must be given "a narrow construction"; and that for the catchall or "residual" category of workers (" 'any other class of workers engaged in foreign or interstate commerce' ") to apply, the worker must, under the *ejusdem generis*

6

canon, share common attributes with seamen or railroad employees, and play a "necessary role in the free flow of goods." (*Circuit City*, at pp. 115, 118, 119, 121.)

In assessing whether the section 1 exemption applies, courts must first define the relevant "class of workers" to which the employee belongs and then determine whether that class of workers is " 'engaged in foreign or interstate commerce.' " (*Southwest Airlines Co. v. Saxon* (2022) 596 U.S. 450, 455 (*Saxon*).) Workers need not be employed by a company in the transportation industry to be exempt under section 1. (*Bissonnette v. LePage Bakeries Park S., LLC* (2024) 601 U.S. 246, 253.) Rather, determining the relevant " 'class of workers' " requires examination of the work activity of the employee—e.g., the "actual work that the members of the class, as a whole, typically carry out." (*Saxon*, *supra*, 596 U.S. at pp. 455–456.) Furthermore, the worker need not physically move goods or people across state or international lines in order for the exemption to apply. (*Id*. at p. 461.) Importantly, there is a sufficient "nexus to interstate commerce" for section 1 purposes if the worker performs " 'activities within the flow of interstate commerce.' " (*Saxon*, at pp. 462–463.)

Here, Doss is in a class of workers whose primary duty is to drive tractor trucks to move and position 53-foot trailers containing auto parts that were shipped to Tesla's factory in the stream of interstate commerce. The hostlers move the trailers from a parking or docking area on the factory grounds to a warehouse where the parts will first be unloaded and eventually used in the assembly of automobiles. There appears no dispute these workers directly handle out-of-state goods and do so exclusively within the confines of the factory grounds. What is contested is whether yard hostlers are "engaged in . . . interstate commerce" while performing this work. The

7

resolution of disputes such as this "requires a case-by-case factual determination, with the party opposing the motion to compel arbitration bearing the burden to demonstrate that the exemption applies." (*Betancourt*, *supra*, 62 Cal.App.5th at p. 559.)

We begin by noting that several courts have interpreted what it means for a worker to be "engaged in . . . interstate commerce" in different contexts, and it is useful (though not dispositive) to view the workers in these cases as falling along various points of a continuum. " 'The most obvious case' " for applying the section 1 exemption involves a worker who " 'directly transports goods in interstate, such as [an] interstate truck driver.' " (*Garrido v. Air Liquide Industrial U.S. LP* (2015) 241 Cal.App.4th 833, 840 (*Garrido*).) Further along the continuum are cases like *Saxon* and *Ortiz v. Randstad Inhouse Servs., LLC* (9th Cir. 2024) 95 F.4th 1152 (*Ortiz*), both of which involved workers who did not physically transport goods or cargo across state lines but handled them somewhere in the middle of their interstate journeys.

*Saxon* involved an airline ramp supervisor who frequently loaded and unloaded baggage, mail, and commercial cargo on and off airplanes that were travelling across the country. (*Saxon*, *supra*, 596 U.S. at p. 453.) In holding the section 1 exemption applied, *Saxon* found it "plain that airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods." (*Id.* at p. 457.) Such workers are "intimately involved with the commerce (*e.g.*, transportation) of that cargo. '[T]here could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit." (*Id.* at pp. 458–459.)

*Ortiz* involved a worker at an international supply chain warehouse for Adidas.  The warehouse received products from mostly international locations and held them temporarily before they were shipped to retailers and end-use consumers.  (*Ortiz, supra*, 95 F.4th at pp. 1157, 1161.)  Ortiz's role was to move the packages to and from storage racks and prepare them for shipment.  (*Ibid.*)  The Ninth Circuit held that Ortiz, like the ramp supervisor in *Saxon*, "fulfilled an admittedly small but nevertheless 'direct and necessary' role in the interstate commerce of goods:  Saxon ensured that baggage would reach its final destination by taking it on and off planes, while Ortiz ensured that goods would reach their final destination by processing and storing them while they awaited further interstate transport.  [¶] Both were also 'actively engaged' and 'intimately involved with transportation,' " as they both handled goods during "a necessary step in their ongoing interstate journey to their final destination." (*Id.* at p. 1162.)

Even further along the interstate commerce continuum are cases involving so-called " 'last-mile' " delivery drivers—"contractors who deliver packages from a warehouse to end-use consumers on a predominantly intrastate basis." (*Ortiz, supra*, 95 F.4th at p. 1160.)  As *Saxon* cautions, the applicability of section 1 "will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." (*Saxon, supra*, 596 U.S. at p. 457, fn. 2.)  To that point, courts have reached differing conclusions as to whether last-mile delivery drivers are engaged in interstate commerce within the meaning of section 1. (Compare *Lopez v. Cintas Corp.* (5th Cir. 2022) 47 F.4th 428 [last-mile delivery driver not exempt under section 1] and *Wallace v. Grubhub Holdings, Inc.* (7th Cir. 2020) 970 F.3d 798, 801–802 [food delivery worker not exempt] with *Rittman v. Amazon.com, Inc.* (9th Cir.

9

2020) 971 F.3d 904 (*Rittmann*) [last-mile drivers for Amazon.com were exempt transportation workers]; *Waithaka v. Amazon.com, Inc.* (1st Cir. 2020) 966 F.3d 10 [same]; *Betancourt*, *supra*, 62 Cal.App.5th at pp. 554–555, 559, 561 [same].)

In *Betancourt*, the plaintiff worked for a last-mile delivery company whose main client was online retailer Amazon.com. (*Betancourt*, *supra*, 62 Cal.App.5th at pp. 555–556.) In concluding the driver was exempt, this court relied on *Nieto v. Fresno Beverage Co., Inc.* (2019) 33 Cal.App.5th 274, 284 (*Nieto*), which held a beverage delivery driver fell within the section 1 exemption even though he made only intrastate deliveries. "The beverages, including some manufactured out-of-state, were sent first to an in-state warehouse and held for a short period of time, and then picked up by the driver and delivered to customers." (*Betancourt*, at p. 559, citing *Nieto*, at p. 284.) These deliveries "were essentially the last phase of a continuous journey of the interstate commerce." (*Nieto*, at p. 284; see also *Rittman*, *supra*, 971 F.3d at p. 916 [holding "Amazon packages do not 'come to rest' at Amazon warehouses, and thus the interstate transactions do not conclude at those warehouses"]; *Carmona v. Domino's Pizza, LLC* (9th Cir. 2023) 73 F.4th 1135 (*Carmona*) [employees who delivered pizza ingredients from a supply center to local pizzeria franchisees were " 'engaged in a single, unbroken stream of interstate commerce' " and were thus exempt under section 1].)

In *Flowers Foods, Inc. v. Brock* (2026) 608 U.S. ___ (*Brock*) [146 S.Ct. 1358], the United States Supreme Court addressed last-mile deliveries, holding that a worker who transports goods on a purely intrastate leg of an interstate journey can be exempt under section 1 even though the worker does not "cross state lines or interact with a vehicle that does." (*Id.* at p. 1364.) Recognizing that interstate commerce "involves not just crossing

state lines, but intrastate activity too" (*ibid.*), *Brock* concluded that "individuals can sometimes be direct, necessary, and active participants in moving goods 'from . . . points in one state' to 'points in another state' without crossing state lines or interacting with vehicles that do (*id.* at p. 1365).

In seeking to distance itself from this latter line of decisions, Tesla contends the work of a yard hostler is even "further removed from the channels of interstate commerce or the actual crossing of borders" (*Saxon*, *supra*, 596 U.S. at p. 457, fn. 2) than the last-mile delivery cases. Tesla emphasizes that Doss did not pick up goods that were temporarily stored at an off-site warehouse and bring them to Tesla's factory; rather, he remained on Tesla's factory grounds at all relevant times and moved trailers full of auto parts that had already arrived in a parking and docking area on the grounds. In Tesla's view, it is significant these auto parts were not themselves destined for further transit but were to be incorporated into vehicles assembled at the same factory site.

Even so, we are not persuaded such circumstances sever the connection between Doss's work and the flow of interstate commerce so as to make him ineligible for exemption under section 1. As *Saxon* and other decisions instruct, the proper focus of our inquiry must be on the actual work being performed. (*Saxon*, *supra*, 596 U.S. at pp. 455–456.) When such work plays a "direct and 'necessary' role" in the interstate commerce of goods (*Saxon*, at p. 451; *Oritz*, *supra*, 95 F.4th at p. 1162) and is part of a "continuous interstate transportation" (*Rittmann*, *supra*, 971 F.3d at p. 916), section 1 extends to that worker.

Here, Doss played a direct and necessary role in the completion of interstate commercial transactions. A worker is " 'no doubt' " engaged in interstate commerce when " 'unloading' . . . cargo from a vehicle carrying

11

goods in interstate transit" (*Saxon*, *supra*, 596 U.S. at pp. 458–459), and while the record here does not indicate that Doss physically unloaded the trailers,[1] he performed preparatory work necessary to that end by moving the trailers from the part of the factory grounds where they were temporarily parked to the warehouse where they could be safely and efficiently unloaded. True, these purely intrastate (and admittedly "intrafactory") activities came at the logistical end of the auto parts' journey. Importantly, however, there was still a direct "nexus to interstate commerce" (*Saxon*, at pp. 462–463) because the goods were still packed in the very same trailers that had traveled interstate, and the yard hostlers' handling of these trailers for subsequent removal of their contents was essential to completion of the interstate delivery. Indeed, Tesla's own description of the job represents that yard hostlers "facilitate . . . receiving functions." If, as the United States Supreme Court has held, the unloading of a vehicle carrying goods in interstate transit constitutes activity within the flow of interstate commerce for purposes of section 1 (*Saxon*, at pp. 458–459), the necessary preparatory work of Tesla's yard hostlers to facilitate that unloading likewise fits the bill.

In resisting this conclusion, Tesla argues its yard hostlers handle goods that have already " 'come to rest' " at their " 'final destination' " and are therefore no longer moving within the flow of interstate commerce. We have no quarrel with the general proposition that the flow of interstate commerce must be said to end at some discernible point in time,[2] and that end-of-line

_____

[1]    In his opposition brief below, Doss stated he "felt pressure to complete all of his job duties timely so that the *warehouse workers timely unloaded* auto parts as received and could complete production deadlines." (Italics added.)

[2]    In *A.L.A. Schechter Poultry Corp. v. United States* (1935) 295 U.S. 495 (*Schechter Poultry*), the United States Supreme Court overturned a conviction under the federal Live Poultry Code, holding that the flow in

12

work bearing only a " 'casual' or 'incidental' " relationship to the interstate movement of goods are not activities within the flow of interstate commerce. (*Immediato v. Postmates, Inc.* (1st Cir. 2022) 54 F.4th 67, 79 (*Immediato*).) But we are not persuaded that the particular facts of this case justify such a conclusion for the work performed by Tesla's yard hostlers. As discussed, the hostlers are responsible for driving (i.e., transporting) the trucks that haul trailers arriving from out of state to the docks where the trailers can be unloaded. This is hardly incidental to the interstate transaction that brought the trailers to the factory gate; it is a necessary step to completing it.

Tesla repeatedly cites *Immediato* for the proposition that "interstate movement necessarily terminates when those goods arrive at the local manufacturer or retailer (as local manufacturing and retailing have not been understood to be 'in' interstate commerce)." (*Immediato*, *supra*, 54 F.4th at p. 77.) But *Immediato* is inapposite, as it involved the local delivery of take-out meals from local restaurants and comestibles and sundries from local grocery stores. (*Id.* at p. 72.) The court held that even though the goods and ingredients used in the meals were shipped interstate, "once an interstate shipment arrives at a local retailer and is 'there held solely for local disposition and use,' the goods are no longer considered to be 'in interstate commerce.' " (*Id.*at p. 76.) Here, the work in question is not the delivery of goods that Tesla received from out of state and is now selling locally. Rather,

---

interstate commerce had ceased once the poultry shipped from out of state came "to a permanent rest within the [s]tate." (*Schechter Poultry*, at pp. 542–543.) However, *Schechter Poultry* did not involve the exemption under section 1. Moreover, we do not perceive the economic activity in *Schechter Poultry*—i.e., the handling of poultry by the defendants at their slaughterhouse markets—to be akin to the work of the yard hostlers in this case—i.e., moving trailers shipped from out of state so that the goods contained therein may be unloaded and received.

it is the handling and movement of trailers upon their arrival from out of state in order to facilitate the unloading and receiving of the shipped goods.

Tesla also relies on a passage in *Betancourt* where we distinguished exempt last-mile deliveries of Amazon.com packages from non-exempt deliveries of finished meals prepared by local restaurants using ingredients shipped from out of state. As we remarked, "any interstate journey of an ingredient used to prepare restaurant food ends when it reaches its customer: the restaurant." (*Betancourt*, *supra*, 62 Cal.App.5th at p. 560.) But the instant case does not involve the purely intrastate handling of goods *after* they have been assembled with out-of-state components. Rather, it involves the handling of the trailers packed with out-of-state components upon their arrival at the factory.

Tesla's attempt to glean a categorical section 1 "come to rest" or "final destination" rule from the last-mile delivery cases is likewise unavailing, as none of these decisions articulated a bright-line test that controls as a matter of law. In highlighting that the warehouse worker handled goods before they reached their "final destination," *Ortiz* was simply pointing out that the goods were still at an intermediate step in their "ongoing interstate journey." (*Ortiz*, *supra*, 95 F.4th at p. 1162.) Likewise, when *Rittman* remarked that the packages had not " 'come to rest' " at Amazon.com's local warehouse, the court was merely emphasizing that the final leg of their delivery remained to be completed. (*Rittman*, *supra*, 971 F.3d at p. 916.)[3] These courts did not purport to answer the question of precisely when a shipment may be said to "come to rest" at its "final destination" for purposes of determining whether

---

[3] For its part, *Rittmann* disclaimed any intent to articulate a " 'come to rest' doctrine" and indicated it was simply distinguishing cases like *Schechter Poultry*. (*Rittmann*, *supra*, 971 F.3d at p. 916, fn. 5.)

14

work performed after that point is cut off from the flow of interstate commerce. (See *Vasquez v. State of California* (2008) 45 Cal.4th 243, 254 [cases are not authority for propositions not considered].) The determination of that end point will, as with other section 1 issues, hinge on the specific facts of the case. (See *Betancourt, supra*, 62 Cal.App.5th at p. 559.)

On this score, we believe it is essential to consider the unique logistics that distinguish the completion of an interstate delivery by truck and trailer from, for instance, the hand delivery of a package to a residence. In particular, the auto parts in question were shipped in bulk in 53-foot shipping trailers and deposited in a parking area of an automobile manufacturing facility. The trailers were not the goods ordered; they were the vessels that housed the goods during interstate transport, making them instrumentalities of interstate commerce. (See *United States v. Lopez* (1995) 514 U.S. 549, 558 [instrumentalities of interstate commerce include vehicles used in interstate commerce]; *Sea-Land Service, Inc. v. County of Alameda* (1974) 12 Cal.3d 772, 781 [discussing shipping containers as instrumentalities of foreign and interstate commerce].) Based on this arrangement, Tesla employed yard hostlers to then transport the trailers from where they were deposited and position them so that their contents could be unloaded and moved to the warehouse. That the still-loaded trailers came to a temporary stop on one part of the factory grounds did not cause such a break in the interstate movement as to separate the work of Tesla's yard hostlers from the interstate transaction as a whole. Rather, the work of the yard hostlers was integral to and "a necessary step" in the "ongoing interstate journey" of the auto parts to its logistical end. (*Oritz, supra*, 95 F.4th at p. 1162; see *Carmona, supra*, 73 F.4th at p. 1138 [goods remain in commerce during temporary halt in movement].)

15

Indeed, the facts of this case appear far less debatable than those of the last-mile delivery cases because here, there was no temporary cessation of interstate movement at a remote warehouse. The very trailers that traveled across state lines are essentially handed off to Tesla's yard hostlers to facilitate completion of the delivery and receipt of the goods contained therein.[4] On this record, we conclude Tesla's yard hostlers are exempt transportations workers "engaged in . . . interstate commerce" within the meaning of section 1.[5]

We are unmoved by Tesla's concerns that applying the section 1 exemption in this case will raise uncertainties about where on a given

[4]     As indicated, *ante*, *Brock* held a worker can qualify for section 1's exemption without "cross[ing] state lines or interact[ing] with a vehicle that does." (*Brock*, *supra*, 146 S.Ct. at p. 1364.) Reasonably implied in that holding is the premise that a worker who does interact with a vehicle that has crossed state lines may qualify under section 1. This premise logically extends to workers who, like Tesla's yard hostlers, directly interact with instrumentalities of interstate commerce (i.e., trailers that have been hauled across state lines) by moving them to a site where their contents can be unloaded.

[5]     Though not addressed by the parties, the maxim of *ejusdem generis* supports our decision. This canon of interpretation instructs courts to interpret a " 'general or collective term' " at the end of a list of specific items in light of any " 'common attribute[s]' " shared by the specific items. (*Saxon*, *supra*, 596 U.S. at p. 458.) In *Circuit City*, the court held the catchall category of workers under section 1 must share attributes with " 'seamen' " and/or " 'railroad employees' " in order for the exemption to apply. (*Circuit City*, *supra*, 532 U.S. at p. 115.) Here, we observe that common dictionary definitions of "hostler" include "one who moves locomotives in and out of a roadhouse" (https://www.merriam-webster.com/dictionary/hostler [last visited June 11, 2026]) and "a person who services a truck or a railroad engine at the end of a run" (https://www.collinsdictionary.com/us/dictionary/english/hostler [last visited June 11, 2026]). As the record reflects, the role of Tesla's yard hostlers in moving 53-foot trailers around factory grounds and in inspecting the trucks and trailers for safety and maintenance issues is akin to the role of a railroad hostler.

premises the delivery of a shipment will cause interstate commerce to end (e.g., doorstep, loading dock). Our decision does not rest upon such grounds and instead adheres to *Saxon*'s focus on the actual work being carried out. (*Saxon*, *supra*, 596 U.S. at pp. 451, 456.) Tesla further warns the application of the section 1 exemption in this case will lead to absurd results, such as the conclusion that an employee in a company's mailroom will be considered a transportation worker, as would anyone who simply picks up a package left on a doorstep and brings it into the home. Nothing in our ruling today gives credence to these concerns, as our conclusion rests upon specific facts unique to interstate commerce by trucks and trailers and the particular duties of the yard hostlers in this case.

For these reasons, we conclude the trial court did not err in finding that Tesla's yard hostlers are exempt transportation workers within the meaning of section 1. Because the FAA does not apply, it does not preempt the application of Labor Code section 229 or the holding in *Gentry*, to which we now turn. (See *Perry v. Thomas* (1987) 482 U.S. 483, 492 [FAA preempts Labor Code, § 229]; *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 362–364 [FAA preempts *Gentry* rule].)

**B. Labor Code Section 229**

Section 229 of the Labor Code[6] provides in relevant part that "[a]ctions to enforce the provisions of this article for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate." This statute "authorizes lawsuits for unpaid wages even if the parties agreed to arbitrate these

---

[6] All statutory references in part B of the Discussion are to the Labor Code.

17

claims." (*Muller v. Roy Miller Freight Lines, LLC* (2019) 34 Cal.App.5th 1056, 1070.)

The trial court found section 229 inapplicable to Doss's seventh cause of action for failure to reimburse business expenses but concluded the statute rendered the arbitration agreement ineffective as to his other seven causes of action.[7] In Tesla's view, all eight causes of action failed to meet the requirements for application of section 229. We agree with Tesla in part and conclude Doss's second, third, fourth, and fifth causes of action do not qualify under section 229 because they are not actions for collection of due and unpaid wages arising from sections codified in the same article as section 229. However, we hold the trial court correctly determined that section 229 rendered the arbitration agreement ineffective as to the first and sixth causes of action, as well as the derivative eighth cause of action under the UCL.

As indicated above, section 229 permits a trial court to disregard an arbitration agreement if the action seeks "to enforce the provisions of *this article* for the collection of due and unpaid wages." (Italics added.) The statute "is found in article 1 of division 2, part 1, chapter 1 of the Labor Code, encompassing sections 200 through 244." (*Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 684 (*Lane*).) Here, the second, third, and seventh causes of action are not based on any provisions codified in sections 200 through 244 and are therefore not encompassed within the scope of section 229.

---

[7] The complaint asserts eight causes of action: (1) failure to pay minimum and/or regular wages (§§ 218, 218.5, 218.6); (2) failure to pay overtime wages (§§ 510, 1194, 1198); (3) failure to provide meal periods (§ 512); (4) failure to provide rest periods (§ 226.7); (5) failure to furnish timely and accurate wage statements (§ 226); (6) failure to pay all wages upon termination (§§ 201–203); (7) failure to reimburse business expenses (§ 2802); and (8) violation of the UCL.

While the fourth cause of action for failure to provide rest periods (§ 226.7) and the fifth cause of action for failure to furnish timely and accurate wage statements (§ 226) arise from statutory sections located in article 1, they are not causes of action "for the collection of due and unpaid wages" as required by section 229. In *Lane*, the court concluded a claim for failure to pay unpaid meal and rest period wages under section 226.7 was "not, in fact, an action for the 'collection of due and unpaid wages,' but one for a failure to provide mandate meal or rest breaks." (*Lane*, *supra*, 224 Cal.App.4th at p. 684, citing *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1256–1257 (*Kirby*).) *Lane* further held a claim for failure to provide itemized wage statements did not seek to collect due and unpaid wages. (*Lane*, at p. 684.) We agree with and adopt *Lane*'s conclusions as to Doss's fourth and fifth causes of action.

Doss maintains *Lane* has been superseded by the California Supreme Court's decision in *Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93 (*Naranjo*). We disagree. *Naranjo* concluded premium pay under section 226.7 constitutes a "wage" that "must be reported on statutorily required wage statements during employment [citation] and paid within statutory deadlines when an employee leaves the job." (*Naranjo*, *supra*, 13 Cal.5th at p. 102.) This is because premium pay compensates the employee for having to remain on duty during a meal or rest break. (*Id.* at p. 107.) In so concluding, *Naranjo* rejected the employer's argument that the court's holding was inconsistent with its prior decision in *Kirby*, which held that an action for premium pay under section 226.7 "is not aimed at protecting or providing employees' wages" but instead "is primarily concerned with ensuring the health and welfare of employees by requiring that employees provide meal and rest periods." (*Naranjo*, at pp. 110–111, citing *Kirby*, at

19

p. 1255.)  As *Naranjo* clarified, *Kirby* involved a distinct "inquiry" to determine "[t]he characterization of the nature of an action," which turns "on the nature of the underlying legal violation the action seeks to remedy, not the form of relief that might be available to cure that violation."  (*Naranjo*, at pp. 111.)  But the issue in *Naranjo*—whether premium pay is a wage designed to compensate employees for work—did "not concern" section 218.5 attorney fees or "otherwise turn on the nature of Naranjo's action."  (*Naranjo*, at p. 112.)

In short, *Naranjo* reaffirmed *Kirby*'s holding that the nature of a section 226.7 action is the deprivation of a meal or rest break, not the nonpayment of wages.  (*Naranjo, supra*, 13 Cal.5th at pp. 111–112.)  We agree with Tesla that section 229's application similarly calls for determining the nature of the cause of action under section 226.7 based on its underlying legal violation.  That legal violation is Tesla's alleged failure to provide rest periods to its employees, not its failure to pay wages due.  Accordingly, Doss's fourth cause of action is not for the collection of due and unpaid wages for purposes of section 229.  (*Lane, supra*, 224 Cal.App.4th at p. 684.)  By the same token, the legal violation underlying Doss's fifth cause of action is Tesla's alleged failure to furnish timely and accurate wage statements, not the failure to pay wages due.  This claim, too, is not encompassed by section 229.  (*Lane*, at p. 684.)

Doss's first cause of action for failure to pay minimum and/or regular wages (§§ 218, 218.5, 218.6) and his sixth cause of action for failure to pay all wages upon termination (§§ 201–203) expressly arise from provisions under the same article as section 229.  Tesla, however, argues these causes of action are merely "stylized" as claims for payment of wages but are really claims for statutory penalties (under section 203) and attorney fees (under sections

20

218.5 and 218.6). We disagree. The first cause of action makes no reference to section 203, and while it does seek attorney fees, it primarily seeks recovery of "the unpaid balance of the full amount of the unpaid wages resulting from [Tesla's] wage violations." The basis for this claim is Tesla's alleged failure to pay Doss and the putative class for work they were required to perform while not clocked in. This plainly constitutes a cause of action for the collection of due and unpaid wages within the meaning of section 229. The same goes for the sixth cause of action, which is likewise based on Tesla's failure to timely pay Doss and certain putative class members all wages due and owing at or within 72 hours of their time their employment with Tesla ended.

We disagree with *Lane* to the extent it suggests actions under sections 201 and 202 are not actions to collect due and unpaid wages for purposes of section 229 when, in addition to seeking payment of unpaid wages, they also seek waiting time penalties pursuant to section 203. (*Lane*, *supra*, 224 Cal.App.4th at pp. 680, 684 [holding cause of action for waiting time penalties under sections 201 to 203 did not seek to collect wages due].) As discussed above, the alleged legal violation underlying the sixth cause of action is Tesla's alleged failure to pay wages due at the time Doss and certain putative class members left Tesla's employment. That this cause of action also seeks waiting time penalties is of no consequence, as "the nature of the remedy does not dictate the proper characterization of the legal violation triggering the remedy." (*Naranjo*, *supra*, 13 Cal.5th at p. 112.)

Our conclusion aligns with the California Supreme Court's pointed remark in *Naranjo* that "[u]nlike an employee suing under section 226.7 [failure to provide rest breaks], an employee suing for failure to pay wages by the deadline established in [sections 201 and 202] *is* suing for nonpayment of

21

wages." (*Naranjo*, *supra*, 13 Cal.5th at p. 112.) Likewise, at least one Court of Appeal has disagreed with the "breadth" of the language in *Lane* as to claims under sections 201, 202, and 203, concluding the language of section 229 " 'arguably encompasses a section 203 claim for waiting time penalties based on failure to pay minimum wages.' " (*Villalobos v. Maersk, Inc.* (2025) 114 Cal.App.5th 1170, 1193–1194.)

In sum, we hold the trial court erred in concluding section 229 rendered the arbitration agreement ineffective as to the second, third, fourth, and fifth causes of action, as these are not actions to enforce the provisions of the article in which section 229 is codified and/or for the collection of due and unpaid wages. However, the court did not err in applying section 229 to the first and sixth causes of action, as well as the eighth cause of action under the UCL to the extent it is derivative of the first and sixth causes of action.

## C. *Gentry* Factors

Tesla next challenges the trial court's conclusion under *Gentry* that the class waiver provision was invalid, arguing Doss failed to submit evidence to factually support the court's findings on the first, second, and fourth *Gentry* factors.[8] We find no error.

In *Gentry*, the California Supreme Court articulated four factors that a trial court "must consider" in determining the validity of an employment class action or arbitration waiver: (1) the modest size of the potential individual recovery, (2) the potential for retaliation against members of the

---

[8] It appears the trial court weighed the second *Gentry* factor (potential for retaliation) against Doss, as the court noted there was "no evidence" concerning the likelihood of retaliation. Doss insists the court could have inferred the potential for retaliation based on a purported statement in his declaration that he would have been concerned for his job security had he filed suit while still employed by Tesla. But we see no such statement in Doss's declaration.

class, (3) the fact that absent members of the class may be ill informed about their rights, and (4) other real world obstacles to the vindication of class members' rights to overtime pay through individual arbitration. (*Gentry*, *supra*, 42 Cal.4th at pp. 463–464.) As *Gentry* explained, "[i]f [the court] concludes, based on these factors, that a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration, and finds that the disallowance of the class action will likely lead to a less comprehensive enforcement of overtime laws for the employees alleged to be affected by the employer's violations, it must invalidate the class arbitration waiver to ensure that these employees can 'vindicate [their] unwaivable rights in an arbitration forum.' " (*Id.* at p. 463.)

It is the plaintiff's burden to show the class waiver is invalid "by making a factual showing of the four *Gentry* factors." (*Muro v. Cornerstone Staffing Solutions, Inc.* (2018) 20 Cal.App.5th 784, 792.) The trial court has "broad discretion" in ruling this issue (*id.* at p. 792), and we review that ruling under the deferential abuse of discretion standard (*Truly Nolen of America v. Superior Court* (2012) 208 Cal.App.4th 487, 508).

At the outset, we take Tesla's failure to brief the third *Gentry* factor (absent members being ill informed) as a forfeiture of any claim that this factor weighed against Doss. (*Broad Beach Geologic Hazard Abatement Dist. v. 31506 Victoria Point LLC* (2022) 81 Cal.App.5th 1068, 1093 [failure to raise contention in appellate brief constitutes forfeiture].)

Regarding the first *Gentry* factor (modest potential individual recovery), Doss submitted the declaration of his counsel, Lisa Brevard, in which she prefaced that "the size of the potential individual recovery for [Doss] and the putative class members cannot be precisely calculated at this

23

time, as discovery has not been completed, and [Tesla] did not produce [Doss's] time and pay records as requested in discovery." Brevard nonetheless maintained that "any reasonable estimate shows that individual potential recovery would be modest" and estimated Doss's potential individual recovery, with applicable statutory penalties, to be $25,000. She based her estimate on Doss's term of employment with Tesla (16 months), hourly rate ($24.50), and assumptions that he worked off-the-clock for an average of 30 to 45 minutes each week, suffered daily rest break violations and an average of four meal break violations per week, and incurred $40 a month in unreimbursed business expenses for cell phone use.

Tesla contends Brevard's estimate was too speculative to support the first *Gentry* factor because she "did not include any of the math," and the estimate was not based on any evidence or testimony from Doss himself. But Tesla provides no authority requiring that level of evidentiary detail to make a sufficient factual showing under *Gentry*. We conclude Brevard adequately explained the method by which she arrived at her $25,000 estimate, which was within the range of individual damages found in other cases to satisfy the first *Gentry* factor. (*Garrido*, *supra*, 241 Cal.App.4th at p. 846 [potential individual recovery of $37,000]; *Betancourt*, *supra*, 62 Cal. App. 5th at p. 557 [potential individual recovery from $16,376 to $36,512].) And while Brevard's estimate was based on assumptions, we assume the trial court credited her undisputed statements that discovery was in its early stages and Tesla had not yet produced payroll records, and thus, a more precise estimate was not available at that time.[9]

---

[9] Tesla also criticizes the trial court's observation that potential class actions would have to pay arbitration fees that would further reduce their recoveries, and as Tesla acknowledges, it agreed to pay arbitration fees "in excess of those which would be required if the dispute was decided in a court

Tesla argues there was "absolutely nothing in the record" supporting the trial court's finding on the fourth *Gentry* factor (real world obstacles). In particular, Tesla notes that Doss did not state in his declaration that he or other putative class members would face obstacles in vindicating their rights through arbitration. But the court could reasonably draw inferences in support of the fourth *Gentry* factor from the evidence as a whole, even if Doss did not devote specific portions of his declaration to it. For instance, Doss presented evidence that in comparison to the putative class members' modest hourly wages, class counsel charges an hourly billable rate of $400 per hour and does not typically accept individual wage and hour claims on a contingency basis. From this, the court could reasonably conclude it was not financially viable for yard hostlers to attempt to challenge Tesla's alleged violations on an individual basis. Meanwhile, the court could also "rel[y] on *Gentry*'s reasoning that a 'requirement that numerous employees suffering from the same illegal practice each separately prove the employer's wrongdoing is an inefficiency that may substantially drive up the costs of arbitration and diminish the prospect that the overtime laws will be enforced.' " (*Garrido*, *supra*, 241 Cal.App.4th at pp. 846–847.)

Finally, Tesla does not dispute Doss's argument that invalidation of a class waiver does not require satisfaction of all four *Gentry* factors. On this score, we note that in *Gentry*, the court held trial courts "must consider" the four factors in making two ultimate determinations: whether class arbitration will more effectively vindicate employee rights than individual litigation or arbitration, and whether disallowing a class action will likely lead to less comprehensive enforcement of wage and hour laws. (*Gentry*,

of law." But Tesla does not show how that circumstance materially undermined Doss's showing of potential individual recovery.

25

*supra*, 42 Cal.4th 463.) We see nothing in *Gentry* suggesting all four factors must point in the same direction in order for a court to determine that, on balance, the factors support invalidating a class waiver.

For the reasons above, we conclude Doss made a sufficient factual showing to support the trial court's decision under *Gentry*.

**D. Severance**

Tesla argues that even if the class waiver is invalid under *Gentry*, the trial court abused its discretion in refusing to sever it and enforce the remainder of the arbitration agreement. We agree the court's ruling was based on legal error, but we will remand for further determination of unconscionability issues.

Under Civil Code section 1670.5, " 'a court can refuse to enforce an unconscionable provision in a contract.' . . . . If a contractual clause is found unconscionable, the court may, in its discretion, choose to do one of the following: (1) refuse to enforce the contract; (2) sever any unconscionable clause; or (3) limit the application of any clause to avoid unconscionable results. [Citation.] The 'strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement.' [Citation.] Though the 'statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement,' it 'also appears to contemplate the latter course only when an agreement is "permeated" by unconscionability.' " (*Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 513 (*Ramirez*).)

In determining whether and how to exercise its discretion to sever unconscionable terms, a trial court "should ask whether 'the central purpose of the contract is tainted with illegality.' [Citation.] If so, the contract cannot

be cured, and the court should refuse to enforce it. If that is not the case, the court should go on to ask first, whether the contract's unconscionability *can* be cured purely through severance or restriction of its terms, or whether reformation by augmentation is necessary. [Citation.] If no 'reformation is required,' the offending provision can be severed or limited, and 'the rest of the arbitration agreement left intact,' then severance or restriction is the preferred course for provisions that are collateral to the agreement's main purpose. [Citations.] If the unconscionability cannot be cured by extirpating or limiting the offending provisions, but instead requires augmentation to cure the unconscionability, then the court should refuse to enforce the contract." (*Ramirez, supra*, 16 Cal.5th at p. 516.)

The trial court cited three bases for its refusal to sever the class waiver. First, the court stated that the waiver "appears central to Tesla's purpose because the agreement states, 'Any claim, dispute, or cause of action must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.' " Second, the court found that severance would be contrary to Tesla's own intent because if the court severed the waiver provision and enforced the balance of the agreement, Doss would be able to pursue class arbitration, even though the arbitration agreement expressly limits the arbitrator's authority to consolidate claims among employees and award class-wide relief. Third, the court found that severance of the class waiver would " 'function to condone an illegal scheme,' " and that the defects in the arbitration agreement indicated that Tesla, the stronger party, " 'engaged in a systematic effort to impose arbitration on the weaker party not simply as an alternative to litigation, but to secure a forum that works to the stronger party's advantage.' " We agree with Tesla that the court's analysis was flawed.

As a threshold matter, we observe the class waiver was the only provision the trial court expressly found to be substantively unconscionable,[10] even though Doss's arguments on substantive unconscionability pertained to several other provisions in the arbitration agreement.[11] But the court's conclusion that the arbitration agreement was tainted with illegality merely because it included a class waiver provision cannot be squared with remarks by the Supreme Court in *Gentry*. In particular, *Gentry* concluded "[t]he presence of a class arbitration waiver in an employee arbitration agreement . . . does not by itself 'indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage.' " (*Gentry*, *supra*, 42 Cal.4th at p. 466.) *Gentry* further noted that "severance is particularly appropriate in the case of class arbitration waivers" as distinguished from "limitations on remedies or other limitations that are invalid on their face." (*Ibid.*)[12]

---

[10] To be clear, the trial court stated in its written order that "[r]egarding *procedural* unconscionability, plaintiff has demonstrated that the class action waiver is contrary to California public policy" (italics added) before turning to its analysis of the *Gentry* factors. We believe the court here meant to say, "Regarding *substantive* unconscionability," as it had already finished addressing procedural unconscionability in the prior paragraph.

[11] Specifically, Doss argued the provisions in the arbitration agreement regarding discovery and filing fees were too "ambiguous" to guarantee that he would receive more than minimal discovery in arbitration, and that Tesla would pay all arbitrator fees beyond the initial filing fee.

[12] This is not to suggest that a class action waiver provision cannot support the decision not to enforce an arbitration agreement in its entirety on unconscionability grounds. (See *Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634, 648, 650 [class action waiver's substantive unconscionability depends on its exculpatory effect]; *Olvera v. El Pollo Loco, Inc.* (2009) 173 Cal.App.4th 447, 457 [finding class action waiver substantively unconscionable].)

Severance of the class waiver in this case may be appropriate given that no reformation would be required. (*Ramirez*, *supra*, 16 Cal.5th at p. 516.) Granted, because some of the claims in this case must be sent to arbitration, a potential conflict may arise between the act of severing the class waiver provision and leaving intact subparagraph (c), which states the arbitrator lacks authority to fashion the proceeding as a class action and award class-wide relief. But it seems reasonable to view subparagraph (c)'s limitations as flowing from the class waiver under subparagraph (a), in which case, subparagraph (c) is also an offending provision under *Gentry* that may be severed. This would appear to require no augmentation or reformation other than limiting the two offending provisions so as to permit class arbitration. (See *Ramirez*, at p. 516.)

Though we have thus far agreed with Tesla on the severance issue, we are not yet prepared to instruct the trial court to sever the offending provisions and leave the rest of the arbitration agreement intact. As discussed, Doss challenged several other provisions in the arbitration agreement as substantively unconscionable, and the trial court did not expressly rule on these matters. Assuming for the sake of argument that these provisions are substantively unconscionable, the court could potentially refuse to enforce the entire arbitration agreement as permeated by unconscionability. (*Ramirez*, *supra*, 16 Cal.5th at p. 513.)

In light of these circumstances, we believe it is appropriate to remand the matter to the trial court to make a determination in the first instance as to whether the arbitration agreement is subject to an unconscionability defense based on the arguments advanced by Doss below.

**DISPOSITION**

We affirm the trial court's order to the extent it found Doss and the putative class members exempt from arbitration under the FAA.  However, we reverse in part its order denying Tesla's motion to compel arbitration and remand the matter for further proceedings consistent with this opinion.  In the interests of justice, each side shall bear its own costs on appeal.


_____
Fujisaki, Acting P.J.


WE CONCUR:


_____
Rodríguez, J.


_____
Stewart, J.*

---

*       Presiding Justice of the Court of Appeal, First Appellate District, Division Two, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

Trial Court:          Alameda County Superior Court

Trial Judge:          Hon. Michael Markman

Counsel:              Morgan, Lewis & Bockius LLP, Michael D. Weil, and
                      Ashlee N. Cherry for Defendant and Appellant.

                      Thierman Buck LLP, Joshua D. Buck, Leah L. Jones; The
                      Markham Law Firm, David R. Markham, and Lisa
                      Brevard for Plaintiff and Respondent.

*Doss v. Tesla* (A173210)